United States Court of Appeals,

Eleventh Circuit.

No. 95-2914.

UNITED STATES of America, Plaintiff-Appellee,

v.

Susan DABBS, William Paul Dabbs, John E. Floyd, Thomas E. Moorehead, Defendants-Appellants.

Feb. 6, 1998.

Appeals from the United States District Court for the Middle District of Florida. (No. 94-152-CR-T-24B), Susan C. Bucklew, Judge.

Before HATCHETT, Chief Judge, BARKETT, Circuit Judge, and PROPST[*], Senior District Judge.

HATCHETT, Chief Judge:

A jury in the Middle District of Florida convicted Susan Dabbs, William Dabbs, Thomas Moorehead and John Floyd for a bank fraud scheme involving fraudulent credit card billing. In this appeal, the appellants challenge their convictions and sentences on various grounds. We affirm.

I. FACTS

Susan Dabbs, William Dabbs and Moorehead owned and managed P.S.T. Ltd., Inc. (PST). Susan Dabbs served as president of the enterprise, William Dabbs served as vice-president and Moorehead served as secretary/treasurer. They shared equal responsibility and decision-making authority over the operation. PST represented itself as a telemarketing company engaged in the sale of travel packages and cosmetics. PST mailed certificates at random to prospective customers declaring that the recipient was eligible to receive one of four allegedly valuable awards. The

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

certificate directed the "winner" to call for additional details. A PST representative would subsequently attempt to coerce the caller into purchasing PST products.[1]

As with most telemarketing businesses, PST relied almost exclusively on credit card purchases and informed callers that it preferred payment via credit card. An accurate recitation of the underlying facts requires an explanation of retail credit card transactions and the telemarketing industry.

In order to conduct credit card sales, a business must first enter into a merchant account agreement with a bank (merchant bank) pursuant to which the merchant bank agrees to process future credit card transactions. The business then opens an account (merchant account). In most retail credit card sale transactions, the business provides the merchant bank with a sales slip (draft) representing the customer's credit card information and signature authorizing the charge. The business deposits the draft in its merchant account. The merchant bank subsequently transfers the balance of the charge into the business's merchant account.[2] The business may then draw from that amount and transfer money to separate commercial accounts. The merchant bank thereafter contacts the issuer of the customer's credit card (issuing bank), presents the sales draft and requests reimbursement.

The card-issuing bank bills the customer for the purchase. If the customer returns the purchased item or challenges the validity of the charge without a dispute from the merchant bank, a "charge-back" results and the issuing bank credits the customer's account and asks the merchant bank for a refund. The merchant bank is only entitled to recoup its loss from the business. If the business refuses, lacks sufficient funds or is no longer a functioning enterprise, the merchant bank

---

[1]These products sold for $397.50, $398.50 or $399.50.

[2]The merchant bank retains a "discount fee" for processing the transaction.

absorbs the loss.

The nature of telemarketing companies makes it difficult for those businesses to find merchant banks willing to accept their credit card transactions. Because these businesses conduct sales over the telephone, telemarketers cannot provide merchant banks with a signed sales slip or other documented customer authorization for a sale. Moreover, studies have shown that telemarketing companies generate a substantially greater risk of charge-backs. As a result, VISA-associated banks prohibit telemarketers from directly depositing credit card transactions.

This policy led to the development of "factoring." The telemarketer uses a third-party, non-telemarketing business (factoring merchant) as a conduit for depositing credit card sales. The factoring merchant processes the transaction either through an existing merchant account or through a separate merchant account created for the telemarketing company. The merchant bank processes the transaction as a standard credit card sale and deposits the amount of the sale into the factoring merchant's account. The factoring merchant then retains a fee for the use of the account and disburses the remainder to the telemarketer. VISA-affiliated banks include a provision in their merchant account contracts forbidding factoring.

In 1991, PST began to enlist third parties to establish merchant accounts with First Interstate Bank of South Dakota (First Interstate) without notifying First Interstate that the accounts would be used for factoring.[3] Cherry Payment Systems (Cherry Systems), an independent sales organization that First Interstate hired to locate suitable merchant accounts, facilitated the creation of these accounts. Floyd, an associate of one of PST's suppliers, submitted a fraudulent merchant account application to First Interstate on behalf of New European Research Laboratories (New European).

---

[3]In 1992, First Interstate changed its name to First Premier Bank. We will refer to the bank as First Interstate throughout this opinion.

PST began to deposit drafts into the account, which First Interstate credited. PST deposited a total of $148,427.41 into the merchant account, resulting in a loss of $80,289.44 to First Interstate.

In December 1991, Floyd submitted a second false application to First Interstate in the name of Discount Furniture Warehouse (Discount Furniture). Upon approving the application, First Interstate established two merchant accounts for Discount Furniture. From December 18, 1991, until January 31, 1992, PST used these accounts to factor $559,622.74 in credit card charges. First Interstate lost $509,427.07 from these merchant accounts.

In January 1992, First Interstate became suspicious of Floyd's merchant accounts and reluctant to extend its relationship with him. First Interstate rejected two merchant account applications, in the names of Safety Marine Products and F & K Laboratory, Inc., which Floyd submitted. First Interstate subsequently terminated all of Floyd's merchant accounts.

Floyd thereafter discontinued his relationship with PST. Moorehead, William Dabbs and Susan Dabbs began to look for additional factoring sources and submitted fraudulent merchant account applications on their own. In February 1992, William Dabbs applied for a merchant account with First Interstate under his own name. First Interstate denied the application. William Dabbs also submitted applications under the business names PST and Cee-Dee. First Interstate opened a merchant account for Cee-Dee and transferred $29,929.05 into William Dabbs's commercial account. First Interstate lost $12,140.35 from the Cee-Dee account. In February and March 1992, Moorehead convinced a friend to submit two merchant account applications, on behalf of CAD, Inc. and Alyssa Jewelers, to First Interstate. Before the friend changed his mind and closed the accounts, PST deposited $4,299.21 into the CAD account, later transferring $2,735.95 into a separate commercial account, and deposited $3,184.00 into the Alyssa Jewelers account, transferring $1,170.73 into a separate commercial account. First Interstate did not incur any losses from these

accounts.

In March 1992, Moorehead used Cherry Systems to apply for a merchant account using the name A. Thomas and Company. PST amassed $36,610 in credit card sales in the account. First Interstate transferred $29,487.22 into a commercial account and lost $8,528.68. Moorehead also applied for merchant accounts under the names PST Tours and CD Promotions. First Interstate accepted the applications, losing $21,095.30 on the PST Tours account and $17,931.51 on the CD Promotions account. In April 1992, Susan Dabbs induced an acquaintance to open a merchant account with First Interstate for Nick's Systems, Inc. through Cherry Systems. PST deposited $60,326.00 into the account, and First Interstate lost $14,044.47.

In early 1992, the United States Postal Inspection Service (USPIS) initiated an investigation into factoring. As part of the investigation, USPIS set up an undercover operation. A postal inspector posed as the owner of J & H Sales (J & H), a company with a merchant account at a Barnett Bank (Barnett) located in Tampa, Florida. J & H enlisted an informant who had previously participated in factoring schemes to spread the word that J & H sought to perform factoring services. A business associate of PST advised the informant to contact the company. Moorehead spoke to the informant and called J & H.

The businesses thereafter agreed that J & H would factor PST's telemarketing sales through J & H's merchant account in exchange for a seventeen percent fee. Each of the principals of PST demonstrated their knowledge of this factoring scheme through their conversations with the postal inspector. Moorehead supplied the inspector with the credit card sales for processing and told the inspector where to send the money. Moorehead also admitted to the inspector that PST could not obtain a merchant account for its credit card sales, and instructed the inspector to lie to Barnett about where the sales originated because Barnett would freeze the merchant account if it knew of the

factoring arrangement. Moreover, Moorehead warned the inspector that depositing a substantial amount of sales in a single day or depositing a significant number of sales using the same dollar amount would arouse suspicion at Barnett.

The inspector also engaged in telephone conversations with William Dabbs and Susan Dabbs about the scheme. William Dabbs identified himself to the inspector as Moorehead's partner, acknowledged his awareness of the scheme and inquired about money J & H owed PST. The inspector received a message from Susan Dabbs. When the inspector returned the call, Susan Dabbs told the inspector that PST had not received a wire transfer from Barnett.[4] During a subsequent conversation, the inspector told Susan Dabbs that Barnett had become suspicious and placed a hold on the merchant account. Susan Dabbs responded, "You put too much through your account too quick." As a means of concealing the scheme, she suggested that the inspector falsely inform the bank that he had started a mail order jewelry business. Finally, when the inspector called a third time to tell her that Barnett had discovered the scheme and advised him that factoring was illegal, Susan Dabbs falsely told the inspector that they were not violating the law and instructed the inspector to "credit out" all of the deposited sales so that PST could refactor them through a different merchant account. During the undercover investigation, PST transferred $79,362.50 in credit card sales to J & H for factoring.[5]

Moorehead, Susan Dabbs and William Dabbs ceased doing business as PST in June 1992. A review of First Interstate's records revealed that PST deposited almost $1,000,000 into the various merchant accounts during this period. In total, PST transferred over $800,000 to separate

---

[4]The USPIS did not deposit any sales in the Barnett merchant account or direct Barnett to transfer money to PST.

[5]Again, Barnett did not suffer a loss because the USPIS never authorized the transfer of funds to PST.

commercial accounts. As a result of charge-backs and credits, First Interstate lost $663,456.82.

## II. PROCEDURAL HISTORY

On July 28, 1994, a federal grand jury in the Middle District of Florida indicted Susan Dabbs, William Dabbs, Moorehead and Floyd (collectively, the appellants) on several counts. Count 1 charged the appellants with conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. Counts 2 and 3 charged Susan Dabbs, William Dabbs and Moorehead with substantive counts of bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Count 4 charged Susan Dabbs, William Dabbs and Moorehead with the fraudulent use of an unauthorized access device, the Barnett merchant account number, in violation of 18 U.S.C. § 1029(a)(2) and (b)(1). The case proceeded to trial in the United States District Court for the Middle District of Florida. On April 13, 1995, a jury found the appellants guilty on all counts charged against them in the indictment.

At sentencing, the district court adopted the recommendations of the probation officer in the presentence investigation report (PSR) concerning the applicable offense levels. Regarding the amount of loss attributable to the appellants, the government presented the testimony of First Interstate's legal coordinator, Kathy Baatz, who reported the total merchant account activity, including charges deposited, funds transferred and losses incurred, for each merchant account that PST used. Rejecting the government's suggestion to use the total deposits to determine the intended loss, the court chose to employ the total losses incurred as the more appropriate measurement, holding Susan Dabbs, William Dabbs and Moorehead responsible for $593,456.82, and Floyd responsible for $519,716.51.[6] The court consequently increased each appellant's offense level ten

---

[6]The court declined to attribute First Interstate's total incurred loss to Moorehead, Susan Dabbs and William Dabbs because a PST employee, Jones Calvin Peace, processed approximately $70,000 in credit card sales for a Sheldon Finklestein, who was not affiliated with PST. The district court held that those charges occurred outside the scope of the conspiracy charged in the indictment. The court only attributed to Floyd the losses stemming from the New

points pursuant to section 2F1.1(b)(1)(K) of the United States Sentencing Guidelines for losses of more than $500,000 but less than $800,000. The court also enhanced each offense level two points under section 2F1.1(b)(2)(A) of the guidelines because the scheme involved more than minimal planning. In addition, the court enhanced Floyd's offense level two points under guideline section 3C1.1 for obstruction of justice.

The court imposed concurrent thirty-month sentences against Susan Dabbs and William Dabbs on each count and sentenced Floyd to thirty-six months of imprisonment. The court also imposed joint and several restitution in the amount of $593,456.82 against each appellant, payable to First Interstate. Because Moorehead did not appear at the original sentencing hearing, the court subsequently assessed a two-level enhancement for obstruction of justice. The court sentenced Moorehead to concurrent forty-five month terms of imprisonment and imposed the restitution amount discussed above.

## III. ISSUES

We discuss the following issues: (1) whether the government properly established venue in the Middle District of Florida; (2) whether a merchant account constitutes an "access device" for purposes of 18 U.S.C. § 1029; (3) whether the district court properly calculated the monetary losses attributable to the appellants for purposes of increasing their base offense levels pursuant to section 2F1.1 of the guidelines; and (4) whether the district court erroneously failed to consider Floyd's ability to pay in assessing restitution.[7]

European and Discount Furniture merchant accounts, less the $70,000 that Peace processed.

[7]In addition to the issues enumerated above, the appellants assert several arguments which merit only summary disposition: Susan Dabbs contends that the government failed to present sufficient evidence for the jury to convict her; Floyd argues that the district court erred in enhancing his sentence for obstruction of justice based on his perjured statements before the grand jury; Floyd also challenges the court's imposition of an enhancement based on its finding

IV. DISCUSSION

A. Venue

The first issue we address is whether the government properly established venue in the Middle District of Florida. William Dabbs, Moorehead and Floyd challenge the placement of venue, arguing that the majority of the offenses alleged in the indictment did not occur within that district. *See United States v. Burroughs,* 830 F.2d 1574, 1580 (11th Cir.1987) (criminal defendants have the right to trial in the district in which the crime was committed), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988). William Dabbs and Moorehead contend that PST only deposited credit card receipts in merchant accounts with First Interstate, which is based in South Dakota. They allege that their only contact with the Middle District of Florida arose as a result of the USPIS investigation—after the postal inspector initiated contact with the appellants. According to William Dabbs and Moorehead, the government improperly orchestrated this contact for the purpose of creating venue. Floyd contends that the government should not have brought him to trial in the Middle District of Florida because he had no contact with that district.

The government counters that the appellants waived this issue when they failed to contest venue before the district court. Moreover, the government contends that in an action involving a conspiracy, venue is proper in any district in which an overt act in furtherance of the conspiracy took place. The government also argues that it did not initiate contact for the purpose of creating venue. Rather, the appellants voluntarily accepted J & H's offer to factor credit card transactions through Barnett. Finally, the government urges us to adopt the position of the Fourth Circuit, which has

---

that his involvement required more than minimal planning; and Moorehead contends that his failure to appear at his original sentencing hearing did not warrant an enhancement for obstruction of justice. We reject these contentions as meritless and affirm pursuant to Eleventh Circuit Rule 36-1.

expressly rejected the "manufactured venue" or "venue entrapment" argument.

We hold that the appellants waived their venue challenge when they failed to raise it in the district court. "Because defendants did not file a motion for a change of venue prior to trial, they waived any objection to venue and may not raise it for the first time on appeal." *United States v. Bustos-Guzman,* 685 F.2d 1278, 1280 (11th Cir.1982); *see also United States v. Hankins,* 581 F.2d 431, 438 n. 11 (5th Cir.1978) ("It is elementary that venue can be waived if not timely raised."), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Kitchen v. United States,* 532 F.2d 445, 446 (5th Cir.1976) ("Defects relating to venue are waived unless asserted prior to trial."); *United States v. Dryden,* 423 F.2d 1175, 1178 (5th Cir.) (same), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970).[8]

The appellants rely upon *United States v. Bowdach,* 414 F.Supp. 1346 (S.D.Fla.1976), *aff'd,* 561 F.2d 1160 (5th Cir.1977), for the proposition that a general motion for acquittal is sufficient to preserve a venue challenge unless the district court requires the defendants to particularize their objections. We reject *Bowdach* 's suggestion that defendants do not have to specifically articulate a challenge to venue or that the district court bears responsibility for notifying defendants of their burden. We read this court's holding in *Bustos-Guzman* as requiring defendants to clearly articulate their objection to venue. *Bustos-Guzman,* 685 F.2d at 1280.[9]

---

[8]We recognize that a panel of this circuit has created an exception to the rule that a failure to object to venue before trial constitutes a waiver. In *United States v. Daniels,* 5 F.3d 495, 496 (11th Cir.1993), we held that "when an indictment contains a proper allegation of venue so that a defendant has no notice of a defect of venue until the Government rests its case, the objection is timely if made at the close of the evidence." (Internal quotation marks omitted.). This exception bears no relevance to the case at bar.

[9]We note that other circuits also require defendants to specifically articulate a venue challenge. *See United States v. Potamitis,* 739 F.2d 784, 791 (2d Cir.), *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984); *Gilbert v. United States,* 359 F.2d 285, 288 (9th Cir.), *cert. denied,* 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966).

On the merits, we note that the substance of the appellants' opposition to venue is without merit. The appellants voluntarily entered into an illegal factoring arrangement using a merchant account with a bank in Tampa. "[V]enue is proper in any district where an overt act was committed in furtherance of the conspiracy." *United States v. Smith,* 918 F.2d 1551, 1557 (11th Cir.1990); *see also United States v. Long,* 866 F.2d 402, 407 (11th Cir.1989). The appellants do not contest that the USPIS undercover factoring investigation occurred in Tampa, but contend that venue is proper where the majority of the overt acts occurred. Appellants provide no authority for this proposition, and we reject it as contrary to this court's precedent. Reviewing the underlying facts in the light most favorable to the government and in favor of the jury's verdict, we find that the government proved by a preponderance of the evidence that an overt act of the conspiracy occurred in Tampa. *See Smith,* 918 F.2d at 1557. The government therefore properly established venue in the Middle District of Florida.[10]

B. Sufficiency of the Indictment

Moorehead and William Dabbs contend that the district court lacked jurisdiction over Count 4 of the indictment because Count 4 did not assert a violation of federal law. Count 4 charged that Susan Dabbs, William Dabbs and Moorehead "attempted to traffic in and use an unauthorized access device, namely, merchant account number 440-222-214 issued by Barnett Bank" in violation of 18 U.S.C. § 1029(a)(2). Section 1029(a)(2) prohibits fraud through the use of one or more "access devices." Moorehead and William Dabbs assert that a merchant account number is not an access device as defined under the statute. They thus argue that the indictment was insufficient because

---

[10]The appellants fail to show that the government orchestrated the undercover operation in order to create venue. Accordingly, we decline to address the Fourth Circuit's decision in *United States v. Al-Talib,* 55 F.3d 923 (4th Cir.1995), which refused to recognize a theory of "manufactured venue" or "venue entrapment."

it failed to allege the elements of a crime under the statute. The government contends that the statutory language supports the inclusion of merchant account numbers within the definition of "access device."

We deem an indictment sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. *See United States v. John,* 587 F.2d 683, 688 (5th Cir.), *cert. denied,* 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979); *see also United States v. Cole,* 755 F.2d 748, 759 (11th Cir.1985); *United States v. Kilpatrick,* 821 F.2d 1456, 1461 (10th Cir.1987), *aff'd sub nom. Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). A challenge to the sufficiency of an indictment involves a question of law. *Rodriguez v. Ritchey,* 556 F.2d 1185, 1191 n. 22 (5th Cir.1977) (en banc), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978). We review questions of law under the *de novo* standard. *United States v. Shenberg,* 89 F.3d 1461, 1478 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997).

Moorehead and William Dabbs contest only the first prong of our sufficiency standard, on the ground that a merchant account is not an "access device" for purposes of 18 U.S.C. § 1029. The rule that an indictment must set forth the essential elements of the charged offense

> serves two functions. First, it puts the defendant on notice of "the nature and cause of the accusation as required by the Sixth Amendment of the Constitution. Second, it fulfills the Fifth Amendment's indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime."

*United States v. Fern,* 117 F.3d 1298, 1305 (11th Cir.1997) (quoting *United States v. Gayle,* 967 F.2d 483, 485 (11th Cir.1992) (*en banc* ), *cert. denied,* 507 U.S. 967, 113 S.Ct. 1402, 122 L.Ed.2d 775 (1993)). Moorehead and William Dabbs appear to concede the notice requirement but challenge

whether the indictment fulfilled the second function in arguing that "[t]he indictment cannot be construed reasonably to charge a violation of [section] 1029." Based upon our examination of the statutory language and the legislative history, we hold that a merchant account is an "access device" within the meaning of the statute, and we therefore find the indictment sufficient to confer jurisdiction.

The jury convicted Susan Dabbs, William Dabbs and Moorehead of fraud in connection with access devices, in violation of 18 U.S.C. 1029. Section 1029(a)(2) states a violation if a person "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period." 18 U.S.C. § 1029(a)(2) (1994). Section 1029(e)(1) defines "access device" as

> any card, plate, code, *account number,* electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds....

18 U.S.C. § 1029(e)(1) (1994) (emphasis added).[11] The statute describes "unauthorized access device" as "any access device that is lost, stolen, expired, revoked, canceled, or *obtained with intent to defraud.*" 18 U.S.C. § 1029(e)(3) (1994) (emphasis added).

Although our research shows that no other circuit has yet addressed this issue, we believe

---

[11]Congress inserted the phrase "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier" in an amendment dated October 25, 1994. *See* Communications Assistance for Law Enforcement Act, Pub.L. No. 103-414, 108 Stat. 4279 (1994). While we acknowledge that this amendment took effect after the grand jury indicted the appellants, we do not rely upon the inserted language for our ruling. Moreover, this court recently found that the amendment did not conclusively indicate that the pre-amended version excluded those items. *See* United States v. Sepulveda, 115 F.3d 882, 885 n. 5 (11th Cir.1997).

that the plain language of the statute requires a finding that the indictment sufficiently listed the statutory elements. Section 1029(e)(1) broadly defines "access device" as "*any ... account number ... that can be used ... to obtain money ... or* to initiate a transfer of funds...." (Emphasis added.) A merchant account number is a means of account access. The appellants deposited credit card sales into the account and obtained almost immediate access to those funds. It is thus readily apparent to this court that such account numbers fall within this inclusive definition of access devices.

Moorehead and William Dabbs counter that merchant account numbers do not *initiate* a transfer of funds but rather can only be used to *receive* transfers of funds. We find their argument both misguided and lacking in merit. Congress drafted the definition of "access device" in the alternative, prohibiting the intended fraudulent use of account numbers that can be used to "obtain money" as well as those used to initiate a transfer of funds. It is beyond question that merchant account numbers are able to be used for the purpose of obtaining money. A business must have a merchant account in order to process credit card transactions. The business uses the merchant account number to deposit credit card sales drafts and gain immediate access to those funds. Under the facts at issue, the appellants' scheme provided access to several hundred thousand dollars.[12]

Our analysis of the statutory language is also consistent with the legislative history of the statute. *See Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.,* 3 F.3d 1472, 1477 (11th Cir.1993) (Courts should "construe statutory language to be true to the meaning of the legislation."), *cert. denied,* 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994). "In determining the meaning of

---

[12]Moorehead and William Dabbs also assert that the government failed to show that the merchant account numbers were "unauthorized" access devices under section 1029(e)(3). This claim is clearly meritless. Section 1029(e)(3) defines unauthorized access devices as those that are "obtained with intent to defraud." The evidence at trial clearly established that Barnett prohibits the practice of factoring and that the appellants knew of and intentionally violated this policy.

the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Anderson v. Singletary,* 111 F.3d 801, 803 (11th Cir.1997) (internal quotations omitted). The legislative history clearly shows Congress's intent to prohibit innovative means of access device fraud and contradicts the appellants' attempt to narrowly interpret the statutory definition of "access device." Moorehead and William Dabbs argue that Congress's focus on credit card fraud in enacting this legislation and silence regarding merchant account numbers is evidence that we should not read the statute to include merchant account numbers. To the contrary, Congress enacted this statute in order to prevent the "fraudulent use of [access] devices in connection with credit transactions...." *United States v. Blackmon,* 839 F.2d 900, 914 (2d Cir.1988). Regarding the definition of access devices, Congress stated:

> The definition of this term is broad enough to encompass future technological changes and *the only limitation* ... excludes activities such as passing forged checks. This definition, however, includes the invoices, vouchers, sales drafts and *other manifestations of access devices used between merchants and credit card companies* for payment of access device transactions.

H.Rep. No. 98-894, at 19 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3689, 3705 (emphasis added). Congress sought to enact "broader statutory language in an effort to anticipate future criminal activities ... and, thereby provide greater protection to all participants in the payment device system, including those that [honor] payment devices and consumers." S.Rep. No. 98-368, at 5, *reprinted in* 1984 U.S.C.C.A.N. 3647, 3651. Accordingly, Congress sought to protect merchant account banks to the same extent as issuing banks.

Given the plain language of the statute and Congress's clear intent, we find it appropriate to broadly construe the statutory language of section 1029 to include the innovative means that parties use to gain unauthorized information to engage in fraudulent activities. The jury convicted Susan Dabbs, William Dabbs and Moorehead of using a merchant account number with the intent to

defraud.  We hold that 18 U.S.C. § 1029 proscribes this conduct.

C. Calculation of Loss

All four appellants challenge the district court's calculation of the attributable monetary losses for purposes of increasing their base offense levels pursuant to section 2F1.1 of the sentencing guidelines.  Susan Dabbs, William Dabbs and Moorehead contend that the district court merely accepted the amount of loss proposed in the PSR and failed to compel the government to prove that amount by a preponderance of the evidence.  They argue that the government did not specifically show that all of First Interstate's claimed losses resulted from the conspiracy and that the First Interstate representative who testified at sentencing merely recited the bank's total calculated losses without presenting sufficient documentation supporting the bank's figures.  Floyd argues that the court erroneously held him accountable for losses incurred after he abandoned the conspiracy. Moreover, Floyd asserts that the court should have imputed between $80,000 and $120,000 of the losses to the actions of PST employee Jones Calvin Peace, whom the court found to have processed transactions outside the scope of the conspiracy.  Floyd argues that he instituted a policy reserving fifteen percent of all charge-backs to protect dissatisfied customers but Peace used those reserves for his own purposes and without Floyd's knowledge or authorization.  In response, the government contends that it presented sufficient evidence for the court to reasonably estimate the losses incurred.

Section 2F1.1 of the sentencing guidelines compels the district court to increase a defendant's offense level based on the loss attributable to that defendant.  *United States v. Calhoon,* 97 F.3d 518, 530 (11th Cir.1996), *cert. denied,* --- U.S. ----, 118 S.Ct. 44, 139 L.Ed.2d 11 (1997). The government must prove the attributable loss by a preponderance of the evidence.  *United States v. Sepulveda,* 115 F.3d 882, 890 (11th Cir.1997).  "This burden must be satisfied with "reliable and specific evidence.' " *Sepulveda,* 115 F.3d at 890 (quoting *United States v. Lawrence,* 47 F.3d 1559,

1566 (11th Cir.1995)).

We review the district court's determination of monetary loss under the clearly erroneous standard. 18 U.S.C. § 3742(e) (1994); *United States v. Dominguez,* 109 F.3d 675, 676 (11th Cir.1997). The calculation of loss for purposes of section 2F1.1 is not an exact science. "[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 cmt., n. 8 (1994). "[A]lthough "the district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines,' its reasonable estimate of the intended loss will be upheld on appeal." *Dominguez,* 109 F.3d at 676 (citation omitted) (quoting *United States v. Wilson,* 993 F.2d 214, 218 (11th Cir.1993)). Moreover, the district court may hold all participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. *See United States v. Rayborn,* 957 F.2d 841, 844 (11th Cir.1992) ("all losses caused by fraud or deceit which are governed by ... § 2F1.1 may be imputed to a defendant who was a member of the conspiracy which caused those losses"); *United States v. Fuentes,* 991 F.2d 700, 701 and n. 1 (11th Cir.1993) (limiting *Rayborn* to reasonably foreseeable co-conspirator acts).

We find that the government carried its burden and proved the attributable losses with sufficient indicia of reliability. While the commentary to the guidelines sanctions the consideration of the actual, attempted or intended harm, see U.S.S.G. § 2F1.1, cmt. n. 7, the victim's direct loss is a primary determining factor for calculation of the appropriate enhancement. *Wilson,* 993 F.2d at 217. Each appellant's PSR contains a detailed recitation of the enterprise, including the deposits, transfers and losses pertaining to each merchant account. Moreover, at the sentencing hearing Kathy Baatz testified regarding First Interstate's losses resulting from the appellants' factoring scheme. Baatz presented a documented summary of all losses due to the fraudulent activity on the merchant

accounts which PST manipulated. The government, therefore, presented sufficient evidence to support a reasonable estimate of the actual losses attributable to each appellant. *Dominguez,* 109 F.3d at 676.

We also reject the appellants' contention that the government's calculation of First Interstate's total losses includes transactions executed outside the scope of the conspiracy. Moorehead argues that Floyd used the New European and Discount Warehouse merchant accounts to process credit card sales of non-PST merchandise. Moorehead relies on the assertion that PST only sold its products at three prices, $397.50, $398.50 and $399.50, while First Interstate's records show losses derived from transactions involving other amounts. Thus, according to Moorehead, the district court should have limited the calculated harm to the losses derived from sales in the $397.50 to $399.50 price range.

We reject this contention for several reasons. First, the jury found Moorehead and Floyd (as well as the Dabbses) guilty of conspiring together to commit bank fraud. Regardless of whether Moorehead received profits from each of Floyd's transactions, we are confident that Floyd processed the transactions in order to illegally factor telemarketing credit card sales and defraud First Interstate, thus perpetuating the conspiracy. Second, we find Moorehead's assertion that Floyd's actions occurred outside the cognizance of the other conspirators wanting. At his sentencing hearing, Moorehead acknowledged that he and the other co-conspirators signed a joint venture agreement with Floyd. In addition, a business associate of Moorehead's, Nicholas Bertuccio, testified at trial for the government that Moorehead represented himself as the accountant for Nixsus Marketing (Nixsus). Nixsus was the predecessor to PST and used Floyd's merchant accounts to process credit card sales of varying amounts. We thus reject Moorehead's attempt to narrowly characterize his responsibility for the fraud conspiracy. The facts show that Moorehead played a

pivotal role in the conspiracy. Given his status as Nixsus's accountant and PST's treasurer, we will not allow Moorehead to plead naivete at this juncture. Floyd's actions were reasonably foreseeable and in furtherance of the conspiracy, and the district court properly attributed the losses derived from Floyd's actions to his co-conspirators. *Cf. Fuentes,* 991 F.2d at 701.

Floyd also contends that the court held him accountable for losses incurred outside the scope of his involvement in the conspiracy. Floyd first argues that approximately eighty thousand dollars in losses transpired after he ended his relationship with PST and thus his participation in the conspiracy. In support of his withdrawal argument, Floyd cites to the postal inspector's testimony that Floyd traveled to Michigan between December 15, 1991, and January 15, 1992. Floyd asserts that the other members of the conspiracy processed a significant number of credit card transactions through the New European and Discount Furniture merchant accounts during this period.

"A conspiracy is an ongoing criminal activity for which a participant remains culpable until the conspiracy ends or the participant withdraws." *United States v. Davis,* 117 F.3d 459, 462 (11th Cir.), *cert. denied,* --- U.S. ----, 118 S.Ct. 355, 139 L.Ed.2d 276 *and* --- U.S. ----, 118 S.Ct. 395, 139 L.Ed.2d 309 (1997). A mere cessation of participation in the conspiracy is insufficient to prove withdrawal; the defendant must take affirmative steps to demonstrate his complete repudiation of the conspiracy's objective. *United States v. Young,* 39 F.3d 1561, 1571 (11th Cir.1994). "To establish the affirmative defense of withdrawal from the conspiracy, the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities." *United States v. Starrett,* 55 F.3d 1525, 1550 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996). Floyd's argument

rests solely on his physical distance from, rather than his repudiation of, the actions of his co-conspirators. Contrary to the holdings of *Young* and *Starrett,* Floyd failed to take any affirmative steps to withdraw. Moreover, the postal inspector testified that he did not speak with Floyd until early July 1992. Absent withdrawal, Floyd remained part of the conspiracy and culpable for the losses First Interstate incurred during his trip to Michigan. The district court thus properly held him responsible for the losses derived from the New European and Discount Furniture merchant accounts.

Floyd also argues that the court should have reduced the attributed losses based on Peace's authorized charge-backs. Floyd asserts that he developed a policy of keeping a certain percent of the credit card sales in reserve to cover losses and that Peace independently ran charge-backs totaling over eighty thousand dollars, emptying this reserve account. The district court properly rejected Floyd's contention that Peace, a PST employee, acted without authorization. The court stated,

> I do not think the jury was convinced either that [Floyd] ... was some sort of innocent dupe, or was taken advantage of by Mr. Peace, or anything else. And neither do I. I think [Floyd] knew exactly what was going on, and knew what was going on was illegal.

Peace testified that Floyd recruited him to locate merchant accounts and prepare a list of suitable banks. Peace also noted that he "kept Mr. Floyd informed daily on ... what was happening," even during Floyd's trip to Michigan. The district court properly determined that Peace only exceeded his authority in processing $70,000 for Sheldon Finklestein. At all other times, Peace acted on behalf of Floyd and with Floyd's knowledge and approval.[13]

---

[13]Floyd's implied argument that the court erroneously refused to award him a downward departure lacks merit because Floyd does not show that the district court believed it lacked the authority to depart. *See* United States v. Patterson, 15 F.3d 169, 171 (11th Cir.1994) ("[T]his court has jurisdiction to review [the sentencing court's decision] only if the sentencing court denied downward departure based upon a misapprehension of its own discretionary authority to

D. Restitution

Finally, we consider whether the district court properly ordered Floyd to pay $593,456.82 in joint and several restitution. Floyd argues that the district court erroneously failed to consider his ability to pay.

Pursuant to the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. §§ 3663-64, the district court "shall consider ... the financial resources of the defendant, [and] the financial needs and earning ability of the defendant and the defendant's dependents" before imposing restitution. 18 U.S.C. § 3664(a) (1994); *see also United States v. Davis,* 117 F.3d 459, 463 (11th Cir.1997).[14] The burden rests with the defendant to demonstrate financial resources (or lack thereof) by a preponderance of the evidence. *United States v. Twitty,* 107 F.3d 1482, 1494 n. 14 (11th Cir.1997). "District courts are not obligated to make explicit factual findings of a defendant's ability to pay restitution if the record provides an adequate basis for review." *Twitty,* 107 F.3d at 1493. "In order to warrant a reversal of the restitution order, the challenging party must show that the "record is devoid of any evidence that the defendant is able to satisfy the restitution order.' " *Davis,* 117 F.3d at 463 (quoting *United States v. Remillong,* 55 F.3d 572, 574 (11th Cir.1995)).

Ordinarily, we review the factual determinations comprising the district court's restitution order for an abuse of discretion. *Davis,* 117 F.3d at 462. The record before us reveals, however, that Floyd did not raise an objection to the PSR on this issue or contest it in response to the district court's *Jones* inquiry. A defendant's failure to challenge a restitution order at sentencing constitutes a waiver of the objection. *United States v. Stinson,* 97 F.3d 466, 468 n. 1 (11th Cir.1996), *cert.*

_____

depart downward.").

[14]We recognize that Congress recently amended these sections of the VWPA but we do not apply the revised version because the jury convicted these defendants prior to April 24, 1996. *See* 18 U.S.C.A. §§ 3663-64 note (West Supp.1997); *see also Davis,* 117 F.3d at 462 n. 4.

*denied,* --- U.S. ----, 117 S.Ct. 1007, 136 L.Ed.2d 885 (1997). This waiver limits this court's inquiry to a search for plain error. We will only entertain this issue where the failure to address a perceived error will result in manifest injustice. *United States v. Obasohan,* 73 F.3d 309, 310-11 (11th Cir.1996).

The facts at issue do not lead us to question the integrity of the sentencing process. The district court's imposition of joint and several restitution in the amount of $593,456.82 was not manifestly unjust. The record reveals that Floyd, whose net worth is over $120,000 and who as recently as 1989 earned more than $61,000, is not without the financial means to compensate First Interstate for its losses resulting from the factoring conspiracy. In short, even though the district court failed to make the requisite inquiries before imposing restitution, the record is not "devoid of any evidence that the defendant is able to satisfy the restitution order." *Remillong,* 55 F.3d at 574. Consequently, we affirm the restitution order imposed against Floyd. *See Davis,* 117 F.3d at 463.[15]

AFFIRMED.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion except as to the majority's affirmance of the restitution order imposed against appellant Floyd. I do not believe that the record reflects that the district court considered Floyd's ability to pay $593,456.82 in restitution, especially where the PSI found that Floyd did not have the ability to pay a fine within the guideline range of $6,000 to $60,000. Accordingly, I would remand the case to the district court for consideration of Floyd's ability to pay.

---

[15]To the extent that Floyd challenges the restitution amount, we reject this contention because "[w]here the defendant is convicted of conspiracy to defraud, the district court has the authority to order restitution for the losses caused by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial." *Davis,* 117 F.3d at 462 (internal quotations omitted).