PER CURIAM.
Alleging illegal acts of credit card factoring and money laundering, an information charged the Appellants, Ms. Ruth Lynn Padilla, Ms. Tammy Compton, and Ms. April Szczesny,[1] with racketeering and conspiracy to commit racketeering predicated upon various acts occurring between April 1996, and August 1997. After the trial court denied the Appellants’ individual motions to dismiss the information, each pleaded nolo contendere to the charges reserving the right to appeal the denial of their motions to dismiss. On appeal they present three issues: that the trial court erred in denying the motions to dismiss because the undisputed facts were insufficient to show that they had violated the illegal credit card factoring statute, section 817.62(3)(b), Florida Statutes (1995); that they were entrapped as a matter of law; and that the illegal credit card factoring statute is unconstitutional. After a close examination of the language of the statute as applied to the facts of this case, we conclude that they have presented a meritorious argument on the first issue and reverse, based on it. Because the first issue is dispositive of the case against them, we have no need to reach the entrapment or constitutional issues.
The facts of this case are straightforward but the successful navigation of the facts through the shoals of the language of section 817.62(3)(b), as well as the corn- *661 mercial transactions that the statute seeks to regulate, is not as easily accomplished. A full description of the commercial transactions in this case, factual and theoretical, is necessary for a full understanding of our conclusion.
I. The Business of Credit Card Factoring
We begin by setting forth the mechanics of credit card factoring, both the legal and illegal types. The Court of Appeals for the Eleventh Circuit recently addressed fraudulent credit card factoring in a case originating with telemarketers in Tampa. See United States v. Dabbs, 134 F.3d 1071 (11th Cir.1998). Although Appellants Padilla, Compton, and Szczesny worked in the escort service business, we quote Chief Judge Hatchett’s cogent and concise description of the workings of the business of credit card factoring in the context of telemarketers in Dabbs, because the elements of factoring are applicable in either business context.
In order to conduct credit card sales, a business must first enter into a merchant account agreement with a bank (merchant bank) pursuant to which the merchant bank agrees to process future credit card transactions. The business then opens an account (merchant account). In most retail credit card sale transactions, the business provides the merchant bank with a sales slip (draft) representing the customer’s credit card information and signature authorizing the charge. The business deposits the draft in its merchant account. The merchant bank subsequently transfers the balance of the charge into the business’s merchant account.[2] The business may then draw from that amount and transfer money to separate commercial accounts. The merchant bank thereafter contacts the issuer of the customer’s credit card (issuing bank), presents the sales draft and requests reimbursement.
The card-issuing bank bills the customer for the purchase. If the customer returns the purchased item or challenges the validity of the charge without a dispute from the merchant bank, a “charge-back” results and the issuing bank credits the customer’s account and asks the merchant bank for a refund. The merchant bank is only entitled to recoup its loss from the business. If the business refuses, lacks sufficient funds or is no longer a functioning enterprise, the merchant bank absorbs the loss.
The nature of telemarketing companies makes it difficult for those businesses to find merchant banks willing to accept their credit card transactions. Because these businesses conduct sales over the telephone, telemarketers cannot provide merchant banks with a signed sales slip or other documented customer authorization for a sale. Moreover, studies have shown that telemarketing companies generate a substantially greater risk of charge-backs. As a result, VISA-associated banks prohibit telemarketers from directly depositing credit card transactions.
This policy led to the development of “factoring.” The telemarketer uses a third-party, non-telemarketing business (factoring merchant) as a conduit for depositing credit card sales. The factoring merchant processes the transaction either through an existing merchant account or through a separate merchant account created for the telemarketing company. The merchant bank processes the transaction as a standard credit card sale and deposits the amount of the sale into the factoring merchant’s account. The factoring merchant then retains a fee for the use of the account and disburses the remainder to the telemarketer. VISA-affiliated banks include a provision in their merchant account contracts forbidding factoring.
In 1991, PST began to enlist third parties to establish merchant accounts with First Interstate Bank of South Da *662 kota (First Interstate) without notifying First Interstate that the accounts would be used for factoring. Cherry Payment Systems (Cherry Systems), an independent sales organization 'that First Interstate hired to locate suitable merchant accounts, facilitated the creation of these accounts. Floyd, an associate of one of PST’s suppliers, submitted a fraudulent merchant account application to First Interstate on behalf of New European Research Laboratories (New European). PST began to deposit drafts into the account, which First Interstate credited. PST deposited a total of $148,427.41 into the merchant account, resulting in a loss of $80,289.44 to First Interstate.
[[Image here]]
In early 1992, the United States Postal Inspection Service (USPIS) initiated an investigation into factoring. As part of the investigation, USPIS set up an undercover operation. A postal inspector posed as the owner of J & H Sales (J & H), a company with a merchant account at a Barnett Bank (Barnett) located in Tampa, Florida. J & H enlisted an informant who had previously participated in factoring schemes to spread the word that J & H sought to perform factoring services. A business associate of PST advised the informant to contact the company. Moorehead [a principal of PST and a defendant in this case] spoke to the informant and called J & H.
The businesses thereafter agreed that J & H would factor PST’s telemarketing sales through J & H’s merchant account in exchange for a seventeen percent fee. Each of the principals of PST demonstrated their knowledge of this factoring scheme through their conversations with the postal inspector. Moorehead supplied the inspector with the credit card sales for processing and told the inspector where to send the money. Moore-head also admitted to the inspector that PST could not obtain a merchant account for its credit card sales, and instructed the inspector to lie to Barnett about where the sales originated because Barnett would freeze the merchant account if it knew of the factoring arrangement. Moreover, Moorehead warned the inspector that depositing a substantial amount of sales in a single day or depositing a significant number of sales using the same dollar amount would arouse suspicion at Barnett.
Id. at 1074-76 (footnote omitted).
II. The Facts of the Case Against Padilla, Compton, and Szczesny
The Tampa Police Department suspected escort services of fronting illegal prostitution activities and set up a reverse-sting operation to catch such criminals. To that end, Tampa detectives created a fake business known as “Sunset Enterprises” and housed it in a former credit union building. Sunset Enterprises would provide financial services relating to credit card transactions so that certain people, particularly escort service providers, would conclude that Sunset Enterprises was a credit card factoring merchant. The detectives then went to an Orlando branch of SunTrust Bank to establish a checking account for Sunset Enterprises and a “merchant account” to process the credit card transaction slips they expected to receive from the escort services. One detective told Sun-Trust of their plans and intentions and received authorization from SunTrust to factor credit card transactions from escort services through their newly-established merchant account.
No specific target had been identified by the detectives for Sunset Enterprises, nor did they possess information that any of the Appellants were either prostitutes operating under the guise of escort services or doing illegal credit card factoring. The detectives had a confidential informant call various escort services in the Tampa and St. Petersburg areas, including the services for which the Appellants worked, to advise the escort services that instead of establishing and processing their credit *663 card transaction slips through a merchant account with a bank, Sunset Enterprises was available to process these transactions. Simply stated, Sunset Enterprises solicited their commercial business.
Thereafter, the Appellants accepted Sunset Enterprises’ offer to provide factoring services. Sunset Enterprises’ undercover detectives then advised the Appellants of the proper procedures involved in carrying credit card slips (or drafts) for their customers to sign, and in using the portable printers, supplied by Sunset Enterprises, with the credit card slips. After processing the credit card slips received from the Appellants, Sunset Enterprises would produce a statement .or compilation consisting of the number of credit card slips that had been processed for the Appellants during that month, the slips’ total monetary value, the amount of Sunset Enterprise’s fees, and the net amount due to the Appellants. The Appellants would then receive a check for the net amount due them from Sunset Enterprises. Sunset Enterprises would, in turn, forward the customer transaction credit card slips to SunTrust Bank for payment due it under its arrangement with SunTrust.
The record shows that one escort service provider, the fourth defendant named in the information that also charged the Appellants, expressed concern to a detective running Sunset Enterprises whether what the escort service and Sunset Enterprises were doing was legal. In response, the detective stated that so long as the services for which the escort services were charging were not illegal, such as prostitution, then the process was legal. The detective’s legal advice was, in this limited instance as we discuss below, accurate. The Appellants continued to do business with Sunset Enterprises until at least August 1997.
In October 1997, the State filed an information charging the Appellants with one count of racketeering, and one count of conspiracy to commit racketeering, based on at least 72 predicate acts of illegal credit card factoring and/or money laundering. A sample predicate incident was described in the following manner:

PREDICATE INCIDENT 1

On or about the 22nd day of April, 1996 in the Thirteenth Judicial Circuit of Florida, to wit: Hillsborough County, RUTH LYNN PADILLA did knowingly and without the authorization of the acquirer, as defined by Florida Statute 817.58(1), to wit: SunTrust Bank, did employ, solicit, or otherwise cause a person, to wit: Sunset Enterprises or an agent or employee of Sunset Enterprises, who was authorized by SunTrust Bank to furnish money, goods, services or anything of value upon presentation of a credit card or credit card account number by a cardholder, to remit to the said SunTrust Bank a credit card transaction record of sale that was not made by such authorized person or his agent or employee, to wit: record of charge numbers ..., in violation of Florida Statute 817.62(3)(b) and/or
On or about the 23rd day of April, 1996 in the Thirteenth Judicial Circuit of Florida, to wit: Hillsborough County, RUTH LYNN PADILLA did conduct or attempt to conduct a financial transaction, as defined in Florida Statute 896.101(l)(d), to wit: the remission of record of charge numbers ..., resulting in the transfer, delivery or other disposition of check number ... issued to RUTH LYNN PADILLA from Sunset Enterprises, knowing that the property involved in the financial transaction represented the proceeds of some form of specified unlawful activity, to wit: prostitution related offenses as prohibited by Florida Statute 796.02, 796.04, 796.05 or 796.07 and/or credit card factoring as prohibited by Florida Statute 817.62(3), and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the sources, the ownership, or the control of the proceeds of the said specified unlaw *664 ful activity, in violation of Florida Statute 896.101(2)(a)2.
The parties agree that the following facts were undisputed for purposes of the Appellants’ motion to dismiss:
1. SunTrust Bank authorized Sunset Enterprises to remit to SunTrust Bank through their merchant account credit card transaction slips from escort services;
2. Sunset Enterprises did in fact remit credit card transaction slips to Sun-Trust Bank;
3. Sunset Enterprises authorized the Appellants to bring to it credit card transaction slips signed by their escort service customers, and the Appellants did so;
4. There is no evidence that any escort service customer did not have the legal right to use the credit card issued to him/her as payment for services received;
5. That the Appellants provided escort services to their customers who paid for these services with credit cards; and, for purposes of this case, that these escort services were lawful.
At this juncture, we pause to make two critical observations. First, an escort service can be a legitimate business. Although law enforcement may suspect that in many instances such services are nothing more than a front for illegal prostitution, the record before us contains no evidence of such illegal conduct on the part of the Appellants. Second, credit card factoring, except when prohibited by statute, is also a legitimate business. There is nothing to stop a financial organization, such as SunTrust Bank, from authorizing a merchant account holder to process “third-party-merchant” credit card transaction slips in return for payment of a fee, most likely an enhanced fee, which makes the risk of the business worthwhile. It is an economic decision made by the contracting parties.
III. Illegal Credit Card Factoring under Florida Law
The State charged the Appellants with violations of chapter 817, Fraudulent Practices, Part II, Credit Card Crimes, specifically section 817.62(3)(b). Section 817.62 provides as follows:
817.62. Fraud by person authorized to provide goods or services—
(1) Illegally obtained or illegally possessed credit card; forged, revoked, or expired credit card.—A person who is authorized by an acquirer to furnish money, goods, services, or anything else of value upon presentation of a credit card by the cardholder, or any agent or employee of such person, who, with intent to defraud the issuer, the acquirer, or the cardholder, furnishes money, goods, services, or anything else of value upon presentation of a credit card obtained or retained in violation of this part or a credit card which he or she knows is forged, expired, or revoked violates this subsection and is subject to the penalties set forth in s. 817.67(1), if the value of all money, goods, services, and other things of value furnished in violation of this subsection does not exceed $300 in any 6-month period. The violator is subject to the penalties set forth in s. 817.67(2) if such value does exceed $300 in any 6-month period.
(2) Misrepresentation to issuer or acquirer.—A person who is authorized by an acquirer to furnish money, goods, services, or anything else of value upon presentation of a credit card by the cardholder, or any agent or employee of such person, who, with intent to defraud the issuer, the acquirer, or the cardholder, fails to furnish money, goods, services, or anything else of value which he or she represents in writing to the issuer or the acquirer that he or she has furnished violates this subsection and is subject to the penalties set forth in s. 817.67(2).
(3) Illegally factoring credit card transactions.—
*665 (a) A person who is authorized by an acquirer to furnish money, goods, services, or anything else of value upon presentation of a credit card or a credit card account number by a cardholder, or any agent or employee of such person, who, with intent to defraud the issuer, the acquirer, or the cardholder, presents to the issuer or acquirer, for payment, a credit card transaction record of a sale, which sale was not made by such person or his or her agent or employee, violates this paragraph and is subject to the penalties set forth in s. 817.67(2).
(b) A person who, without the acquirer’s authorization, employs, solicits, or otherwise causes a person who is authorized by an acquirer to furnish money, goods, services, or anything else of value upon presentation of a credit card or a credit card account number by a cardholder, or employs, solicits, or otherwise causes an agent or employee of such authorized person, to remit to the acquirer a credit card transaction record of a sale that was not made by such authorized person or his or her agent or employee violates this paragraph and is subject to the penalties set forth in s. 817.67(2).
(c) Any violation of this subsection constitutes an unfair or deceptive act or practice within the meaning of s. 501.204 and thus the basis for a civil or administrative action by an enforcing authority pursuant to part II of chapter 501.
Section 817.58, Florida Statutes (1995), defines “acquirer” in the following manner:
(1) “Acquirer” means a business organization, governmental entity, financial institution, or an agent of a business organization, governmental entity, or financial institution that authorizes a merchant to accept payment by credit card for money, goods, services, or anything else of value.
In this case, either of two business organizations — Sunset Enterprises or Sun-Trust Bank — is a possible acquirer.[2] Sun-Trust Bank, by setting up a merchant account for Sunset Enterprises, is the acquirer vis-a-vis Sunset Enterprises. Similarly, when Sunset Enterprises authorized the various escort services to bring their credit card slips to it for processing and payment, in effect setting up a merchant account for the escort services, it became the acquirer vis-a-vis the escort service. Although SunTrust Bank did not specifically authorize the Appellants to accept credit card payments, inasmuch as the Appellants never had a merchant account directly with SunTrust Bank, it did authorize Sunset Enterprises to act on its behalf, as an agent acting within the scope of its duties, to process credit card slips. This is the very sum and substance of the business of legal credit card factoring.
Before we attempt to navigate around the shoals of the statute’s language, it is worthwhile to note the statute’s goal. When the term “acquirer” was added to the statute in 1988, the summary of the chapter law stated that it was
prohibiting a person who is paid by credit card for furnishing money, goods, or services or anything else of value to defraud an acquirer, as defined, through counterfeit or false credit card transactions; [and] prohibiting such a person from fraudulently presenting for payment certain credit card transaction records to certain financial institutions or businesses....
Ch. 88-198 at 1087, Laws of Fla. We read this language as directed against the fraudulent merchant account holder who, in the usual course of business is “a person who is paid by credit card for furnishing money, goods, or services,” who seeks to *666 defraud the financial institution that holds its merchant account, usually a bank. The statute’s title — “Fraud by person authorized to provide goods or services” — only underscores this construction. In the usual practice, the acquirer is the financial institution most at risk if the financial dealings are derailed by a fraudulent merchant account holder. This is because the acquirer not only accepts the credit card transaction records from its merchant account holder but also advances the money to its merchant account holder before being reimbursed from the issuing bank when the credit cardholder ultimately pays his bill. If there are disputes resulting in a “charge-back,” the acquirer is left holding the now-empty bag. See Dabbs, 134 F.3d at 1074. We conclude, therefore, that in the case before us, SunTrust Bank is the acquirer who is protected by the statute from fraudulent dealings by its merchant account holders and other merchants farther down the stream of commerce. Because SunTrust Bank is the “acquirer” in this case, Sunset Enterprises became the “factoring merchant” as explained in Dabbs.
IV. Application of the Law to the Facts
At issue in this case is the proper application of subsection 817.62(3)(b). The Appellants’ motion, filed pursuant to Florida Rule of Criminal Procedure 3.190(c)(4), argued that there were no material disputed facts and the undisputed facts did not establish a prima facie case of guilt. The State responds that the Appellants’ motion to dismiss was properly denied because the acquirer, SunTrust Bank, never directly authorized the Appellants to submit credit card slips to SunTrust Bank for ultimate processing; SunTrust Bank only so authorized Sunset Enterprises. We reject this argument because it allows the State to criminalize and prosecute legitimate commercial behavior. Assume, for purposes of illustration, that SunTrust Bank authorized Sunset Enterprises to use its merchant account for factoring credit card transaction slips from medical clinics and the Appellants were physicians running such a clinic. If Sunset Enterprises solicited the Appellants’ business and offered to factor the credit card slips that their patients signed in exchange for medical services, SunTrust Bank would never have reason to deal with Drs. Padilla, Compton, and Szczesny. But, using the State’s argument, the State could choose to prosecute these physicians because they had not been “authorized” by SunTrust Bank. In a legitimate factoring business, the acquirer only authorizes the factoring merchant, see Dabbs, 134 F.3d at 1075, who holds the merchant account at the acquirer’s institution, and never deals with the third-party-merchant. The third-party-merchant only deals with the “middleman” or the acquirer’s agent, i.e., the factoring merchant. This is the raison d’&tre of the credit card factoring business.
The gravamen of section 817.62 as a whole, under our facts, is to protect Sun-Trust Bank, the acquirer, from fraud originating lower down the stream of commerce by those who come to it for financial services through credit card sales. Subsection (1) proscribes conduct by the merchant account holder, “with intent to defraud the issuer, the acquirer, or the cardholder,” through the use of a credit card that is not valid in some way (illegally obtained, forged, revoked, etc.). Subsection (2) proscribes conduct by the merchant account holder (or the one whom the acquirer authorizes), again with intent to defraud the acquirer, in getting reimbursement for goods or services that the merchant has not provided. Subsection (3)(a) proscribes fraudulent credit card factoring by the merchant who holds the merchant account with the acquirer.[3] Subsection (3)(b), the subsection applied *667 to the Appellants here, proscribes credit card factoring “without the acquirer’s authorization.” This is the crux of this case because it is the acquirer’s authorization that distinguishes legal credit card factoring from illegal credit card factoring.
Trying to salvage its prosecution of the Appellants, which is heading for a wreck on these shoals, the State analogizes this reverse sting operation to one in which law enforcement goes undercover to sell items to purchasers who are led to believe that the items are stolen. See § 812.019, Fla. Stat. (1995) (dealing in stolen property). Section 812.028, Florida Statutes (1995), precludes certain defenses to the crime of dealing in stolen property, such as the fact that the item in question is not really stolen.[4] This section enables a government-sponsored fencing reverse sting operation. In contrast, section 817.62(3)(b) has no “defenses precluded” section that specifically negates an essential element of the crime for purposes of a law enforcement sting. As the Appellants have argued, the illegal credit card factoring statute is not “sting-friendly” when one fulfills all the requirements for a legitimate credit card factoring business. Cf. Dabbs (credit card factoring reverse sting operation successfully completed by United States Postal Inspection Service without authorization from the acquirer, Barnett Bank of Tampa).
Insisting on following its stolen property analogy to the bitter end, the State further argues that the crime of dealing in stolen property is proven by the intent of the individual committing the crime; if the defendant thinks the property is stolen and either buys or sells it, the crime is complete. Therefore, continues the State’s argument, if a third-party-merchant/defendant thinks that she is doing illegal credit card factoring, the necessary intent is there. This latter statement is a correct statement of the law, cf. Dabbs, but the undisputed fact in the case before us is to the contrary: the detective running Sunset Enterprises assured the escort service providers, upon specific inquiry, that what Sunset Enterprises was doing was legal and that the escort service providers were also safe as long as their credit card slips were not the product of illegal activity such as prostitution. Due to the nature of a legitimate credit card factoring business, only the factoring merchant can provide the knowledge if he or she has the proper authorization for factoring from the acquirer. If the factoring merchant has the proper authorization from the acquirer, then the third-party-merchant can lawfully have a credit card transaction processed for her through the factoring merchant’s merchant account. The statute seeks to protect the merchant bank/acquirer by prohibiting unauthorized acts of the factoring merchant, an otherwise authorized merchant account holder, who is defrauding its merchant bank/acquirer, by being the unauthorized conduit for the third-party-merchant’s credit card slips. This is the fraudulent situation, like that described in Dabbs, where the missing authorization results in the crime prohibited by subsection 817.62(3)(b). Subsection 817.62(3)(b) does not even require any degree of mens rea on the part of the third-party-merchant, unlike the other subsections of section 817.62. The State’s complex reverse sting operation failed because *668 the necessary element of “without authorization” of the acquirer was absent. This reverse sting operation actually was a legitimate credit card factoring business, unlike the illegal acts described in Dabbs. This illustrates why the statute is not “sting friendly.”
As a final comment, due to the nature of the business of credit card factoring, we have difficulty in envisioning the situation where a third-party-merchant violates subsection (3)(b) without a merchant account holder accomplice who is violating subsection (3)(a). When the merchant account holder accomplice violates subsection (3)(a) by processing the unauthorized third-party-merchant’s credit card slips, the mens rea is shared by the third-party-merchant when he or she presents the slips to the factoring merchant for the unauthorized processing, i.e., the crime described in (3)(b). When the statute is read in this manner, the statute fulfills its purpose of protecting the acquirer and does not impose any unconstitutional presumptions. See generally Chicone v. State, 684 So.2d 736, 740 (Fla.1996) (“Although the legislature may punish an act without regard to any particular (specific) intent, the State must still prove general intent, that is, that the defendant intended to do the act prohibited.”); Waites v. State, 702 So.2d 1373, 1375 (Fla. 4th DCA 1997) (observing that existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American jurisprudence; that strict liability crimes are disfavored; in strictly construing criminal statutes, mens rea requirement is dispensed with only upon a “clear statement” from the legislature that scienter is not an essential element of the offense; and holding that there was no indication that the legislature intended to dispense with a mens rea requirement in enacting the statutory subsection allowing the court to consider other evidence in a prosecution for operating a motor vehicle, without having driver’s license, in a careless and negligent manner resulting in death of another human being).
V. Conclusion
The Appellants’ argument in their rule 3.190(c)(4) motion was well taken. The undisputed facts did not show that they had committed the crime of illegal credit card factoring where SunTrust Bank authorized Sunset Enterprises to factor credit card slips from escort services. The motion to dismiss should have been granted. Although this conclusion may impede law enforcement reverse stings in commercial contexts that intersect with criminal intent, we are duty bound to interpret the statutes in their intended manner and in a way that assumes their constitutional application.
We reverse the convictions and sentences with directions to discharge the Appellants.
PATTERSON, C.J., and CASANUEVA and SALCINES, JJ., Concur.

. The same information also charged a fourth defendant but she is not a party to this appeal.

 The merchant bank retains a "discount fee” for processing the transaction.

. Because of the ambiguity as to which entity in this case is the acquirer under section 817.62(3)(b), the Appellants have argued that the statute is unconstitutional as applied to them. Because we decide this case on a different ground, assuming for our purposes that SunTrust Bank was the acquirer, and Sunset Enterprises its duly authorized agent, we have no need to reach the constitutional question.

. Under our facts, if Sunset Enterprises had not been the arm of law enforcement and had fraudulent intent to obtain money from Sun-Trust Bank, their fraudulent credit card factoring could have been prosecuted under subsection (3)(a).

. Section 812.028 specifically provides:
812.028. Defenses precluded.
—It shall not constitute a defense to a prosecution for any violation of the provisions of ss. 812.012-812.037 that:
(1) Any stratagem or deception, including the use of an undercover operative or law enforcement officer, was employed.
(2) A facility or an opportunity to engage in conduct in violation of any provision of this act was provided.
(3) Property that was not stolen was offered for sale as stolen property.
(4) A law enforcement officer solicited a person predisposed to engage in conduct in violation of any provision of ss. 812.012-812.037 in order to gain evidence against that person, provided such solicitation would not induce an ordinary law-abiding person to violate any provision of ss. 812.012-812.037.