United States Court of Appeals,

Eleventh Circuit.

No. 96-4526

Non-Argument Calendar.

UNITED STATES of America, Plaintiff-Appellee,

v.

Mario DOMINGUEZ, a.k.a. German Oliva, Defendant-Appellant.

April 7, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 95--656-Cr), Stanley Marcus, District Judge.

Before ANDERSON and BLACK, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

KRAVITCH, Senior Circuit Judge:

After pleading guilty to conspiring to commit credit card fraud,[1] Mario Dominguez appeals his sentence as excessive in light of the loss occasioned by his conduct. We affirm.

I.

When Secret Service Special Agent Roberto Villanueva learned that Antonio Gonzalez was in the market to sell stolen and counterfeit credit cards, he arranged an undercover sting of Gonzalez's operation. Upon meeting Gonzalez, Special Agent Villanueva expressed an interest in doing business and purchased one counterfeit card and one stolen to verify that they were usable. Two days later, Gonzalez provided twenty additional stolen

---

[1]It is a crime to produce, use, traffic in, or possess counterfeit access devices or device-making equipment with intent to defraud. 18 U.S.C.A. §§ 1029(a)(1), (a)(3) (Supp.1996). Conspiracy to commit these acts is also a crime. *Id.* § 1029(b)(2). "Access devices" include credit cards. *Id.* § 1029(e).

credit card numbers which he claimed could be made into working cards and gave these numbers to Special Agent Villanueva to verify. Secret Service agents confirmed that the available credit on nine of these cards was approximately $250,000.[2]

When Special Agent Villanueva next spoke to Gonzalez, he told Gonzalez the amount of available credit on the nine cards and ordered those cards manufactured immediately. The parties negotiated a price of $40,000 for the cards, based upon a percentage of the cards' available credit. Gonzalez told Special Agent Villanueva that "Mieto"—later identified as appellant Dominguez—would produce the cards. Gonzalez then telephoned Dominguez and Jose Rodriguez, an unindicted co-conspirator, who actually made the counterfeit cards. Gonzalez instructed Dominguez to make the nine cards and told him that the cards had approximately $200,000 in available credit.[3] Authorities arrested Dominguez the next day, when he took delivery of his share of the proceeds from the sale.

## II.

Following his guilty plea, the district court sentenced Dominguez pursuant to U.S.S.G. § 2F1.1, under which a defendant's base offense level is increased relative to the financial loss associated with the crime. The court increased Dominguez's offense

---

[2]Special Agent Villanueva testified that he and other agents only had time to check on the credit available in nine of the twenty accounts between meetings.

[3]Dominguez protests that Gonzalez never informed him of the cards' available credit. The district court, however, specifically credited Special Agent Villanueva's testimony to the contrary. Upon review of the record, we find no error.

eight levels to reflect a fraud in excess of $200,000. Dominguez timely objected to this ruling and argues here that the district court misapplied section 2F1.1. We review the district court's interpretation of the Sentencing Guidelines *de novo, United States v. Toussaint,* 84 F.3d 1406, 1407 (11th Cir.1996), and its loss calculations for clear error. *United States v. Calhoon,* 97 F.3d 518, 530 (11th Cir.1996).

Generally, a defendant sentenced under section 2F1.1 is subject to an offense level increase based on the greater of: (1) the actual loss associated with a crime; or (2) the intended loss. U.S.S.G. § 2F1.1, comment. (n. 7); *Calhoon,* 97 F.3d at 531. In cases of credit card fraud, a court may not estimate the actual loss at less than $100 per card. U.S.S.G. § 2B1.1, comment. (n. 3).[4] Dominguez argues that he should be held liable only for the $100-per-card minimum, reasoning that there is insufficient evidence of intended loss and no actual loss, as the credit cards were sold to the government. We disagree.

The district court's estimate of the intended loss from the conspiracy was not clear error. A court's valuation of loss "need not be made "with precision.' " *United States v. Wilson,* 993 F.2d 214, 218 (11th Cir.1993) (quoting U.S.S.G. § 2F1.1, comment. (n. 8)); U.S.S.G. § 2B1.1, comment. (n. 3). Rather, although "the district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines," *Wilson,* 993 F.2d at 218, its reasonable estimate of

---

[4]Section 2F1.1 incorporates the valuation of loss provisions discussed in section 2B1.1. U.S.S.G. § 2F1.1, comment. (n. 7).

the intended loss will be upheld on appeal.  *See* U.S.S.G. § 2F1.1, comment. (n. 8).   Here, because Dominguez knew that he was producing cards with approximately $200,000 in available credit and because the price charged by the conspirators reflected a percentage of that credit, the district court estimated that Dominguez intended a loss in excess of $200,000.  This was proper. Where the district court has evidence that the defendant knew the amount of available credit on counterfeit cards he conspired to produce and distribute, the available credit is a reasonable estimate of the intended loss.[5]

This holding comports with rulings from our sister circuits. *See, e.g., United States v. Egemonye,* 62 F.3d 425, 428-29 (1st Cir.1995) (where defendant instructed others to use cards to withdraw cash at or near credit limits and arranged for deposit of stolen checks to replenish limits, use of aggregate credit limit was reasonable estimate of intended loss);  *United States v. Koenig,* 952 F.2d 267, 271-72 (9th Cir.1991) (where defendant once stated that each stolen cash card could yield $500, use of $500 per card estimate reflected defendant's intended gain and was

_____

[5]We express no opinion as to the proper result in a case where the defendant is unaware of the credit limits of, or available credit on, counterfeit cards and the district court bases its sentence on those amounts. *Compare United States v. Sowels,* 998 F.2d 249, 251 (5th Cir.1993) (where defendant stole credit cards, he put fraud victims at risk of losing entire amount of credit available, so use of credit limits of cards was reasonable estimate of intended loss), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994) *with United States v. Allison,* 86 F.3d 940, 943-44 (9th Cir.1996) (declining to follow *Sowels* in fraud case;  insisting on "realistic, economic approach to determining what losses the defendant truly ... intended to cause").  It suffices for this case to hold that a sentence based on the available credit known to the defendant is a reasonable estimate of the intended loss.

reasonable estimate of intended loss).  Although Dominguez urges us to follow *United States v. Yellowe,* 24 F.3d 1110 (9th Cir.1994), it is not contrary to our holding.  In that case, the court approved as reasonable the district court's valuation of loss based on the $100-per-card minimum.  It did not, however, establish that $100 is the "presumed loss," as Dominguez asserts,[6] nor did it cast doubt on the rule we apply here.  Unlike the instant case, the government adduced no evidence in *Yellowe* that any loss might result from the stolen credit card numbers—the court noted that the district court received testimony about the scheme, but the government "did not know how much available credit any of the customers had."  *Id.* at 1112.  Thus, we conclude that *Yellowe* is distinguishable and that our holding is consistent with other courts' decisions on this issue.

## III.

Accordingly, Dominguez's sentence is AFFIRMED.

---

[6]Indeed, *Yellowe* stands for the opposite presumption.  The court noted that $100 is "the presumed *minimum* loss" per card. *Id.* at 1112 (emphasis added).