[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
05/21/99
THOMAS  K. KAHN
CLERK

No. 97-4711

D. C. Docket No. 94-8108-CR-DTKH


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODNEY HEDGES,

Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Florida


**(May 21, 1999)**


Before TJOFLAT and DUBINA, Circuit Judges, and SMITH*, Senior Circuit Judge.

---

*Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

The defendant, Rodney Hedges, pled guilty to one count of securities fraud, in violation of 15 U.S.C. § 78j(b) (1994) and 17 C.F.R. § 240.10b-5 (1998). The district court determined that the loss attributable to Hedges' fraudulent conduct exceeded $92 million, and sentenced him to 84 months of imprisonment based on that loss. Hedges appeals his sentence on two grounds. First, Hedges claims that there was insufficient evidence that he reasonably foresaw a $92 million loss, and thus the district court erred by sentencing him based on that amount. Second, Hedges asserts that the Government violated its obligation in the plea agreement to recommend a sentence based on a loss of only $6.8 million. We affirm.

I.

From 1985 until 1992, Hedges was involved in a conspiracy fraudulently to raise the price of stock in Cascade International, Inc. ("Cascade"), and sell the overvalued stock to the public. During this period, Hedges was a registered representative at a number of brokerage firms that were "market makers"[1] for stock in Cascade.

To accomplish their scheme, Hedges' co-conspirators, Victor and Jeannette Incendy, purchased substantially all of Cascade's outstanding stock. The conspirators[2] then disseminated false information to the public that stated, among other things, that Cascade operated a large

---

[1] A market maker is a dealer who, with respect to a particular security, is willing to buy and sell the security for its own account on a continuous basis. See 15 U.S.C. § 78c(a)(38) (1994).

[2] In addition to Hedges and the Incendys, the conspirators included an accountant named Bernard Levy and a Cascade executive named John Sirmans.

number of cosmetics and women's apparel stores and that these operations were highly profitable. In reality, Cascade operated only a few stores, its business ventures generated almost no revenue, and the company was operating at an enormous loss.

As a result of the conspirators' misrepresentations, the price of Cascade's stock rose from $.25 per share to a high of $11.75 between 1985 and 1991. As the stock's value increased, the conspirators secretly sold their shares in the company. When their fraudulent conduct came to light in November 1991, approximately eighteen million shares of Cascade stock held by the public immediately became worthless.

Hedges played an important role in several aspects of this scheme. First, to conceal the fact that Cascade's principals were selling their shares in the company, Hedges opened a number of accounts using fictitious names at the firms where he was employed. Hedges' co-conspirators then placed their Cascade stock in these accounts and Hedges sold the stock. From 1987 until 1991, Hedges sold millions of shares through these accounts and received approximately $600,000 in kickbacks for his efforts.

Second, Hedges facilitated these stock sales by misleading the stock transfer agent into improperly issuing "freely tradable" shares rather than restricted shares, or improperly removing the restrictive legend from the stock. As a result of this deception, the conspirators were able to avoid federal securities laws that would have hampered their ability to sell their stock.

Third, Hedges helped disseminate false information about Cascade in order to induce the public to invest in the company. Hedges and the other conspirators distributed this information by issuing fraudulent financial statements, audit opinions, and other documents to potential investors, brokerage firms, and the media. Hedges also prepared and disseminated

3

"independent" research reports that recommended investing in Cascade's securities. These reports purported to provide his objective analysis of Cascade as an investment opportunity; they failed to disclose Cascade's true financial condition, the fact that Cascade's principals were secretly selling all of their shares in the company, or that Hedges was receiving large kickbacks from these sales of Cascade securities.

On October 6, 1994, a federal grand jury returned a 132-count indictment against Hedges and his co-conspirators. Hedges was charged with 59 of these counts.[3] On January 24, 1997, Hedges entered into a written plea agreement with the Government. Hedges agreed to plead guilty to count five of the indictment, which charged him with securities fraud in connection with the sale of 140,000 shares of Cascade, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. In return, the Government agreed to dismiss the remaining counts of the indictment against him. Hedges and the Government also agreed "to recommend that [Hedges'] base offense level be increased by fourteen (14) levels, pursuant to Guidelines Section 2F1.1,[4] because the losses relating <u>directly</u> to [Hedges'] fraudulent conduct was [sic] approximately

---

[3]  Hedges was charged with 26 counts of securities fraud, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; 1 count of mail fraud, in violation of 18 U.S.C. § 1341 (1994); 2 counts of wire fraud, in violation of 18 U.S.C. § 1343 (1994); 25 counts of money laundering, in violation of 18 U.S.C. § 1956(a) (1994); 4 counts of conducting sales of unregistered securities, in violation of 15 U.S.C. § 77e(a) (1994); and 1 count of conspiracy, in violation 18 U.S.C. § 371 (1994). The Government also sought criminal forfeiture against Hedges pursuant to 18 U.S.C. § 982 (1994).

[4] Under U.S.S.G. § 2F1.1, the base offense level for crimes involving fraud or deceit is increased based on the amount of loss that resulted from the offense; the higher the loss, the greater the defendant's offense level. <u>See</u> United States Sentencing Commission, <u>Guidelines Manual</u>, § 2F1.1 (Nov. 1, 1998).

4

$6,800,000."[5]  (Emphasis added).  The plea agreement did not bind the parties in regard to the total loss that the public suffered as a result of the conspiracy.

After the district court accepted Hedges' guilty plea, its probation office prepared a presentence investigation report ("PSI").  Although the PSI noted that both Hedges and the Government recommended only a 14 level increase to Hedges' base offense level pursuant to the plea agreement, the PSI recommended an 18 level increase; the PSI stated that the total loss caused by the fraudulent scheme exceeded $92 million,[6] and concluded that Hedges was responsible for the entire sum (rather than $6.8 million) under U.S.S.G. § 2F1.1(b)(1).[7]

At the sentencing hearing on April 11, 1997, the court concluded that the total loss that resulted from the fraudulent scheme exceeded $92 million.  Further, the court found that Hedges played a central role in the conspiracy, and therefore held him responsible for the entire loss.[8]

---

[5] The plea agreement stated that Hedges understood that the court was not required to follow this recommendation, and could "impose any sentence authorized by law."

[6] The probation office determined this total loss estimate as follows: Of the 18 million Cascade shares that were outstanding when the fraudulent scheme came to light in November 1991, 13 million were traded at an average price of $4.00 per share and the remaining 5 million shares were traded at an average price of $5.00 per share.  The total value of the outstanding shares therefore was $77 million.  This entire amount was lost because Cascade's stock became worthless when the conspiracy was discovered.  The probation office then added to this figure approximately $15 million that was lost by financial institutions that had loaned money to Cascade.  Thus, the probation office estimated that the total loss exceeded $92 million.

[7] Hedges objected in writing to the PSI's conclusion that a $92 million loss should be attributed to him.  He did not object to the sections of the PSI that described the conspirators' fraudulent scheme and Hedges' role in that conspiracy.

[8] The court expressly noted that it reached this conclusion despite the Government's recommendation that only $6.8 million be attributed to Hedges.

Based on this loss, the court increased Hedges' base offense level by 18 levels[9] and sentenced him to 84 months of incarceration.

## II.

Hedges first challenges his sentence on the ground that there was insufficient evidence to sentence him based on a loss of $92 million. He claims that the evidence was insufficient for two reasons.

First, Hedges contends that the district court improperly relied on conclusory statements in the PSI for its decision to sentence him based on the entire loss. Hedges points out that under U.S.S.G. § 1B1.3(a)(1), he could not be sentenced based on a $92 million loss unless the Government proved that he caused (or "reasonably foresaw" the acts that caused) that loss. The only "evidence" the district court relied on to support its finding that he was responsible for the entire loss was the PSI's conclusory statements that described his role in the conspiracy. Hedges asserts that these statements were not a substitute for evidence, see United States v. Lawrence, 47 F.3d 1559, 1567-68 (11th Cir. 1995) (holding that the evidence was insufficient to support the district court's findings when the court relied on conclusory statements in the PSI that were not supported with facts), and that the evidence therefore was insufficient to support the court's decision to sentence him based on the entire loss.

We disagree that the court improperly relied on the PSI's conclusory statements. Unlike the defendants in Lawrence, Hedges did not object to the statements in the PSI on which the

---

[9] Hedges had a resulting base offense level of 28 (which included a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1).

district court relied. Thus, these statements were undisputed, and the court was permitted to rely on them despite the absence of supporting evidence.[10]

These undisputed statements were sufficient to support the court's finding that Hedges caused (or reasonably foresaw) the acts that resulted in a $92 million loss because they established that he played an important role in the overall conspiracy. First, the PSI showed that Hedges helped disseminate false information about Cascade that created a market for the worthless stock. Because it was this false information that induced the public to invest in Cascade (and thereby suffer $92 million in losses), Hedges' action made him responsible for the entire loss that the public suffered from the fraudulent scheme.

Second, the PSI established that Hedges played a central role in selling the conspirators' stock and covering up their illegal activities; Hedges helped deceive the stock transfer agent so that the conspirators could avoid federal securities laws that would have prevented them from selling their Cascade shares, and he established accounts in fictitious names so that the conspirators could conceal their illegal stock sales. These actions also made him responsible for the entire loss caused by the conspiracy; without Hedges' assistance, the conspirators could not have sold their shares and thereby have harvested the fruits of their fraudulent activities. We therefore conclude that the undisputed statements in the PSI were a sufficient basis for the court's finding that Hedges was responsible for the entire loss that resulted from the scheme.

---

[10] Prior to finding the amount of the loss attributable to Hedges, the district court specifically noted that these PSI statements were undisputed. The court stated: "Mr. Hedges' activity is laid out in substantial detail in the [PSI] which is before the court without objection." Cf. Lawrence, 47 F.3d at 1567 (stating that a district court may not "sentence a defendant in the absence of sufficient evidence when that defendant properly objects to a [PSI's] conclusory factual recitals" (emphasis added)).

Hedges' second contention regarding the sufficiency of the evidence is that the Government failed to prove that he had the requisite intent to cause a $92 million loss because the evidence did not show that he knew the stock was worthless. Hedges points out that the PSI's $92 million loss estimate was based on the fact that Cascade's stock had no actual value; Hedges contends that he could not be held responsible for the $92 million loss unless the Government proved that he <u>knew</u> the stock was worthless. This, Hedges argues, the Government failed to do.[11]

We reject Hedges' assertion that the amount of loss that a sentencing court calculates under U.S.S.G. § 2F1.1 can be no greater than the loss that the defendant knew would be inflicted. Knowledge is not necessarily relevant to the amount of loss that is attributed to a defendant for sentencing purposes. We have previously held that "[d]efendants sentenced under section 2F1.1 generally receive 'an offense level increase based on the <u>greater</u> of: (1) the actual loss associated with a crime; or (2) the intended loss.'" <u>United States v. Bald</u>, 132 F.3d 1414, 1416 (11th Cir. 1998) (quoting <u>United States v. Dominguez</u>, 109 F.3d 675, 676 (11th Cir. 1997)) (emphasis added); <u>accord</u> U.S.S.G. § 2F1.1, comment. (n.8). Because the actual loss ($92 million) was greater than the loss that Hedges subjectively believed would result from the scheme, the court correctly sentenced him based on the actual loss.

III.

---

[11] Hedges claims that he believed the company's operations generated some revenue. Thus, although he knew the stock was overvalued, Hedges contends that he did not know that the stock was completely worthless.

8

Hedges next contends that the Government violated its obligation under the plea agreement to recommend that he be sentenced based on a loss of only $6.8 million. Hedges claims that the Government took three actions (either at the sentencing hearing or in its response to his written objections to the PSI) that breached the agreement: First, the Government endorsed the PSI's $92 million total loss estimate and put on evidence at the sentencing hearing to support that estimate; second, the Government contended that Hedges played a "crucial role" in the conspiracy;[12] and third, the Government disputed his narrow interpretation of "relevant conduct" under U.S.S.G. § 1B1.3.[13] Hedges contends that the Government's conduct invited the court to sentence him based on the entire $92 million loss rather than on a loss of only $6.8 million.

After imposing sentence, the district court offered Hedges the opportunity to object to its findings of fact and its application of the Guidelines, and to the sentence imposed. See United States v. Jones, 899 F.2d 1097, 1103 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136, 1137 (11th Cir. 1993) (en banc). Because Hedges failed to

---

[12] The Government took this action in response to Hedges' claim that he was "far less culpable" than his co-conspirators and that he therefore should receive a lower sentence.

[13] Hedges contended that "relevant conduct" is limited to actions that constitute the offense of conviction; because he only pled guilty to the fraudulent sale of 140,000 Cascade shares, he claimed that his relevant conduct should not include his other fraudulent activities or those of his co-conspirators. In response, the Government pointed out that the definition of relevant conduct is much broader than Hedges' interpretation; it includes all acts of the defendant and all reasonably foreseeable acts of his co-conspirators that were undertaken in furtherance of the conspiracy.

raise this objection at that time, it is barred absent plain error.[14]  See United States v. Mahique,

150 F.3d 1330, 1332 (11th Cir. 1998).[15]

We find no such error for the simple reason that the Government did not violate the plea

agreement.  The agreement did not bind the Government regarding the total loss that resulted

from the scheme, the level of Hedges' involvement in the conspiracy, or the proper interpretation

of "relevant conduct."  Thus, the Government was free to engage in the conduct of which

---

[14] Hedges erroneously contends that he preserved this issue at the sentencing hearing. Toward the end of the hearing, Hedges requested a downward departure from the Sentencing Guidelines even though the plea agreement prohibited him from seeking such a departure. When the court asked Hedges whether the agreement prevented him from seeking a departure, he responded as follows:

> I would submit no, and the reason I submit no, we can't take, nor should we take, any contract agreement provisions out of context, that this was all put under the context of what was negotiated that we perceived that we were going to be sentenced with the $6,000,000 figure, and that it was under – with that situation that we said we wouldn't ask for any downward departures. . . . [I]n light of what has happened here, I think that grounds now exist . . . which weren't in existence at the time, and now in light of the rulings of the court as relates to the amount, I think that the provisions of the plea agreement do not bar us from requesting this because we are dealing with a whole different situation.

(Emphasis added).  Hedges claims that this statement preserved his objection.  His interpretation of this statement is that he was asserting that he was no longer bound by the plea agreement (and therefore could seek a downward departure) because the Government had violated the agreement; thus he placed the issue of whether the Government breached the agreement before the district court.

We disagree with his interpretation of this statement; nowhere in his response to the court did Hedges assert that the plea agreement had been breached.  A more plausible interpretation of his statement (as is demonstrated by the highlighted portion) is that he was contending that the plea agreement only prohibited him from seeking a downward departure if the court attributed a $6.8 million loss to him.  Because the court ruled that he was responsible for a much higher loss, Hedges contended, the plea agreement did not prevent him from seeking a downward departure. Thus, Hedges did not claim that the Government violated the plea agreement and his objection was not preserved.

[15] Plain error is error that is both obvious and prejudicial.  See United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777-78, 123 L. Ed. 2d 508 (1993).

Hedges complains. The plea agreement obligated the Government to recommend that Hedges be sentenced based on a $6.8 million loss. The Government repeatedly made that recommendation during the sentencing hearing and therefore fulfilled its obligation.

IV.

For the foregoing reasons, Hedges' sentence is

AFFIRMED.

11