[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 16, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16019
Non-Argument Calendar

_____

D. C. Docket No. 05-00024-CR-4-SPM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEPHEN O. ADETONA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(October 16, 2007)**

Before BLACK, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

Stephen O. Adetona appeals his sentence following his conviction for

conspiracy to commit bank fraud, mail fraud, and wire fraud in violation of 18 U.S.C. §§ 1344, 1349 and for bank fraud in violation of 18 U.S.C. § 1344. Adetona argues that the district court erred in holding him accountable for the entire intended loss attributable to the conspiracy because the government failed to prove that he was involved from the very beginning and that the full scope of the conspiracy was reasonably foreseeable to him. Adetona also argues that the district court erred in adjusting his offense level upward three levels based on his role in the offense. For the reasons stated below, we affirm.

## I. Background

Adetona was indicted for conspiracy to commit wire, bank, and mail fraud in violation of 18 U.S.C. § 1349 (count 1) and twenty-six counts of bank fraud in violation of 18 U.S.C. § 1344. Adetona pleaded guilty to the conspiracy and counts twenty-six and twenty-seven involving bank fraud. According to the Presentence Investigation Report ("PSI"), the conspirators obtained stolen identification which they used to open bank accounts and obtain debit and credit cards. They deposited counterfeit or stolen checks into the accounts and then withdrew or transferred the funds for their own use. The conspiracy had three branches operating in Florida, New York, and Chicago. Approximately 60 financial institutions were victimized and over 100 individuals had their identities

stolen by these conspirators. The total amount of money involved in the scheme exceeded $5 million.

Adetona was considered the right-hand man of the head of the Florida operation, a man named Adeniran. As such, he took over operation of the Florida operation when Adeniran traveled to Nigeria, often for months at a time. Phone calls intercepted by government investigators revealed nearly 400 incriminating conversations related to the fraud involving Adetona, including an average of 10 phone calls a day between Adetona and Adeniran. Adetona also directed other individuals to commit specific acts to assist the fraud; for example, he instructed one man named Ola, to pick up bank mail from mail drops and another to answer phone calls from banks to prevent them from discovering the fraud on phone lines he had set up for this purpose. Adetona received identification materials from Daphnee Philias procured by her at his request, and also instructed her to deposit fraudulent checks he provided into her account. Other intercepted phone calls revealed Adetona and his common-law wife, Adeyinka Cheese, discussing problems with financial institutions rejecting deposited checks and whether other banks had been "hit" before. Adetona himself opened at least one bank account with false identification, deposited money into that account, and then had the money transferred to the account of a co-conspirator for later withdrawal.

In the PSI, the probation officer assigned a base offense level of seven under U.S.S.G. § 2B1.1(a)(1)(2005) with various special offense characteristics bringing the total adjusted offense level to thirty-one. The two sentencing calculations at issue in this appeal are the eighteen level increase for the amount of actual and intended loss of approximately $5.4 million pursuant to U.S.S.G. § 2B1.1(b)(1)(J) and the three level enhancement for role in the offense pursuant to U.S.S.G. § 3B1.1(b). Adetona objected to the PSI on both grounds.

Adetona stated that "it was not until early 2004 [] that law enforcement became aware" of his involvement in the conspiracy. He pointed to the specific acts in which he had participated personally and argued he should be held accountable only for the amount of loss involved in those transactions—an amount just over $30,000. He also argued that he may have "exercised some supervision over Cheese and Philias" but had no control over other individuals other than to pass along messages from Adeniran and, therefore, should not receive an enhancement for role in the offense.

At sentencing, the government presented testimony from FBI Special Agent Jonathan Trimble who had investigated the fraud. In addition to describing the general scheme of the conspiracy, Agent Trimble testified that generally Adetona would receive a one-third share of the proceeds of a deal he was involved in – a

4

share equal to that of Adeniran and the New York group. Trimble also testified that Adetona directed other participants in their roles, and that Adetona and Cheese—separately from the jobs done at Adeniran's request—had extracted thousands of dollars from a credit card they obtained from a contact in Canada.

At the conclusion of the evidence, the court overruled Adetona's objections to amount of loss and role in the offense, finding that (1) the amount of loss included actual and intended loss, and that Adetona was responsible for the amounts obtained by the reasonably foreseeable acts of his co-conspirators that were taken in furtherance of the conspiracy; and (2) Adetona supervised at least two others in the scheme that clearly involved five or more people. The court then adopted the guideline calculations set out in the PSI, but imposed a sentence below the range in light of Adetona's cooperation with authorities based upon the government's § 5K1 motion. The court sentenced Adetona to 72 months imprisonment, 5 years supervised release, and ordered restitution in the amount of $170,681.47.

Adetona appeals the amount of loss attributed to him and the adjustment in his sentence based on his supervisory role.

## II. Standard of Review

After United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d

621 (2005), although the guidelines are advisory rather than mandatory, the district court still must calculate the guidelines range correctly, and the same standards of review apply to its calculations. See United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005). The district court's application of the Sentencing Guidelines is a question of law reviewed de novo. United States v. Spell, 44 F.3d 936, 938 (11th Cir. 1995). An amount of loss determination for sentencing purposes is reviewed for clear error. United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). We review the district court's determination of appellant's role in the offense for clear error. United States v. Mesa, 247 F.3d 1165, 1168 (11th Cir. 2001).

## III. Discussion

### A. Amount of Loss

Adetona's objection to the district court's calculation of the amount of loss for which he was sentenced encompasses two arguments. First, Adetona argues that he should be held accountable only for those losses resulting from his own, specific conduct rather than losses caused by the whole conspiracy. Second, Adetona argues that he should not be responsible for the amount of loss attributable to the whole conspiracy because the government never proved—and the district court never explicitly found—that Adetona was a member of the

6

conspiracy from the very beginning.

*1. Relevant Conduct for Amount of Loss*

Adetona maintains that his sentence should reflect only the amount of loss caused by his own, personal conduct rather than that imputed to him from his co-conspirators. This would have resulted in a 6-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(D) for having caused just over $30,000 in loss rather than the 18-level increase he received pursuant to § 2B1.1(b)(1)(J) for the $5.4 million amount of loss attributable to the whole conspiracy.[1]

Appellant's conviction was based, in part, upon his participation in a criminal conspiracy, and relevant conduct for determining the applicable sentencing guideline range therefore includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). A defendant is accountable under this provision for the conduct of others that was both "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 comment. (n. 2). The guidelines make clear that a defendant's sentence is not limited to those acts committed by that individual, but

---

[1] Adetona does not dispute the amount of loss attributable to the whole conspiracy. He argues instead that he should not be held accountable for the entire amount, but rather only for the loss that resulted from his individual conduct. We, therefore, will not evaluate the appropriateness of the $5.4 million figure.

rather should account for the conduct of others participating in a common criminal scheme that was reasonably foreseeable to the defendant.

To determine what acts of others are reasonably foreseeable to a defendant, the court must engage in a two-prong analysis. United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004). First, the court must determine the "scope of the criminal activity the defendant agreed to jointly undertake." Id. Then, the court must "consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." Id.

Adetona does not dispute the factual evidence of the scope of his participation in the conspiracy, but rather disputes the conclusions to be drawn from it. He argues that the evidence shows that his participation was limited to the substantive offenses in which he personally acted and that all other acts were at the direction of Adeniran and not on his own initiative. He argues that this means the scope of criminal activity to which he agreed was far below that of the whole conspiracy. We disagree.

Adetona points to United States v. Hunter wherein this court held that low-level "runners" on the bottom of the conspiracy hierarchy who were "merely aware" that their activities were part of a larger scheme and never assisted in the design or execution of the scheme should not be sentenced based on the amount of

loss attributable to the whole conspiracy. 323 F.3d 1314 (11th Cir. 2003). Adetona argues that he was a similarly low-level operative and should not be held accountable for the acts of others.

The district court found that the scope of Adetona's involvement in the conspiracy was extensive. Adetona himself participated in many fraudulent acts in this conspiracy. But most important, he was also the right-hand man of Adeniran—the head of the entire Florida operation—and spoke with Adeniran ten times a day. Adetona even acted for Adeniran by managing the operation when Adeniran traveled to Nigeria for months at a time, including contacting the New York and Chicago branches of the organization to continue coordinating the nation-wide conspiracy during Adeniran's absences. Additionally, Adetona and his wife initiated separate deals of their own, indicating that Adetona's work expanded the impact of this fraud scheme. Adetona's high level of involvement in the conspiracy demonstrates that he was more than "merely aware" of the full extent of the conspiracy. Adetona agreed to jointly undertake the acts of others by running the organization for long periods, by directing others in their roles in the operation, and by discussing strategy with Adeniran and with Cheese.

The district court did not err by finding that the acts of his co-conspirators were reasonably foreseeable to Adetona. He knew the extent of the scheme, was

involved in coordinating the various branches of the scheme, and assisted the Florida leader in executing the extensive operation. His high level of involvement in the scheme shows that it was reasonable for the district court to conclude that the conduct of his co-conspirators at all other levels would have been reasonably foreseeable to Adetona and that, therefore, he should be held accountable for the entire amount of loss attributable to the conspiracy.

### 2. Date of Entry into the Conspiracy

Adetona also argues that he should not be held accountable for losses caused by his co-conspirators prior to the date that he joined the conspiracy.

The only statement made to the district court regarding this argument was one phrase in the January 30th letter objecting to the PSI. Adetona's attorney stated that "it was not until early 2004[] that law enforcement became aware of Mr. Adetoda's (sic) involvement." No further statements were made as to the date Adetona did join the conspiracy nor to the legal effect that joining the conspiracy at a later date would have on his sentence. For the first time on appeal, Adetona argues that the government was required to prove the exact date on which he joined that conspiracy in order to deduce what acts occurring after that time were reasonably foreseeable to him.

We review arguments raised for the first time on appeal under a plain error

10

standard.  United States v. Rahim, 431 F.3d 753, 756 (11th Cir. 2005).  In order for an error to be plain, it must be obvious or clear under current law. United States v. Gerrow, 232 F.3d 831, 835 (11th Cir. 2000).

The amount of loss need only be a reasonable estimate.  U.S.S.G. § 2B1.1(b)(1) comment. (n. 3(C)) (citing 18 U.S.C. § 3742(e) and (f)). Additionally, the guidelines specify that the amount of loss is defined as the greater of the actual or intended loss.  U.S.S.G. § 2B1.1(b)(1) comment. (n. 3(A)). "Intended loss [] means the pecuniary harm that was intended to result from the offense." Id.  Although a "'district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines,' its reasonable estimate of the intended loss will be upheld on appeal." United States v. Dominguez, 109 F.3d 675, 676 (11th Cir. 1997) (quoting United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993)) (citation omitted).  Because the sentencing judge is uniquely positioned to assess the evidence and estimate loss, that estimate is entitled to appropriate deference.  U.S.S.G. § 2B1.1 comment. (n. 3(C)).

The government bears the burden of proving the amount of loss by a preponderance of the evidence.  United States v. Cover, 199 F.3d 1270, 1276 (11th Cir. 2000).  This burden can only be satisfied with "reliable and specific evidence."

United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997).

Given these parameters, the district court did not plainly err by estimating that the amount of loss attributable to Adetona encompassed the entire amount of loss attributable to the conspiracy.

It is true that defendants shall not be held accountable for the conduct of others prior to joining the conspiracy. United States v. Wise, 129 F.3d 1209, 1213 (11th Cir. 1997) (citing U.S.S.G. § 1B1.3 comment. (n. 2). In this case, however, there is no evidence as to when the defendant joined the conspiracy. The indictment does indicate that Adetona was actively involved within six months of Adeniran's first deposit of fraudulent checks. Adetona has not made any statements indicating that he was not involved in the conspiracy from the beginning. He stated only that law enforcement "was not aware" of his involvement until 2003 or 2004. Although the government bears the burden of using specific and reliable evidence to prove the amount of loss, the district court has to make a reasonable estimate based on the information available to it. See United States v. Lee, 427 F.3d 881, 893 (11th Cir. 2005). Where the defendant presents no evidence to contradict the reasonable inference from the government's evidence on amount of loss, the district court does not err by relying on the evidence presented by the government. See United States v. Nasroti-Shamloo, 255

F.3d 1290, 1292 (11th Cir. 2001) (holding that the district court did not err in relying on the circumstantial evidence which indicated that the defendant intended to utilize all of the credit available on fraudulently obtained credit cards where the defendant failed to present countervailing evidence).

In assigning the full amount of loss to Adetona, the district court relied on specific and reliable evidence: Adetona's position as right-hand man to Adeniran, his knowledge of the whole fraudulent scheme, and his direction of activities during Adeniran's trips to Nigeria. Taking all of this together, there is more than mere speculation that Adetona was a member of the conspiracy from its inception and can properly be held accountable for the full amount of loss caused by it. This conclusion was a reasonable estimate of the amount of loss attributable to Adetona.

B. Role in the Offense

The district court applied U.S.S.G. § 3B1.1(b) and gave Adetona's sentencing guideline range a three level enhancement for role in the offense. Under § 3B1.1(b), a three level enhancement is appropriate "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Adetona does not dispute that the conspiracy involved five or more participants or was otherwise extensive. Adetona instead asserts that he was not a "manager or supervisor" and

13

that this enhancement was improper for that reason. As stated earlier, we will overturn the district court's determination of Adetona's role in the offense only if that determination was clearly erroneous. United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000).

The evidence does not support Adetona's assertion that he never managed nor supervised others in the conspiracy. Adetona was in charge of the conspiracy for months at a time while Adeniran traveled. Adetona and his common law wife, Cheese, discussed strategy, including which banks had not yet been "hit." Adetona and Cheese also initiated a deal on their own using a credit card obtained from a contact in Canada. Adetona supervised Cheese, Philias, Ola, and others. Adetona also received a one-third share of the profit on deals he participated in—a share equal to that of Adeniran and the New York group.

We do not see how this evidence could be construed as anything less than managerial or supervisory. The district court did not err in concluding that he was a manager or supervisor.

## IV. Conclusion

For the foregoing reasons, Adetona's sentence is **AFFIRMED**.