[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14264
Non-Argument Calendar

_____

D. C. Docket No. 06-60186-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YVONNE MAY RICHARDS, a.k.a. Yvonne Howell,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 15, 2008)

Before MARCUS, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Yvonne May Richards appeals her convictions and sentence of

imprisonment for 121 months for her role in a conspiracy to defraud Medicare. Richards challenges her conviction for conspiracy to pay kickbacks, the denial of her motion for a mistrial, and the calculation of the loss amount. We affirm.

## I. BACKGROUND

Richards was charged in 23 counts of a 43-count indictment for fraud and conspiracy. She was indicted for 19 counts of making false statements, 18 U.S.C. § 1035(a)(2), and one count each of conspiring to submit false claims, id. § 286, make false documents, id. §§ 371, 1035(a)(2), launder money, id. § 1956(h), and pay kickbacks, id. § 371; 42 U.S.C. § 1320a-7b(b)(2)(A). The charges stemmed from a conspiracy to bribe owners and directors of assisted living facilities to refer patients for treatments, submit false claims for sham psychiatric services, and recover payments for those fraudulent claims from Medicare.

Medicare offers its recipients access to psychiatric treatment as part of its partial hospitalization program. Under Medicare guidelines, treatment is restricted to patients who suffer an "acute episode" or "acute exacerbation" of a chronic mental illness. To be paid by Medicare, a service provider must supply documentation to verify that it provides psychiatric services administered by a physician that are reasonable and necessary for the diagnosis or care of a patient and that the patient is capable of active participation in the treatment.

2

The evidence established that Richards was the clinical director of Oakland Community Health Center and oversaw the treatment of patients under the Medicare partial hospitalization program. Richards's daughter, Althea Graves, and Althea's husband, Bernard Graves Jr., oversaw the administration of Oakland. Richards and the Graveses, assisted by other Oakland employees, used kickbacks and falsified documents to defraud Medicare.

Oakland solicited directors of assisted living facilities to refer their residents for treatment and offered a "kickback" of $10 a day for each resident referred. The directors were paid in cash either at the end of the month or after a "big billing." The Graves gave Oakland employee Tabatha Harrell business checks to convert to cash, which Harrell and Richards apportioned among the directors. Harrell and Richards placed the cash in designated envelopes and gave them to the drivers for the different resident facilities with instructions to deliver the envelopes to the directors.

The Graves participated in the kickback scheme. After Harrell cashed the business checks, she occasionally returned the money to the Graves, who gave the cash to Richards. Mashama Brannigan, a secretary and medical transcriptionist, overheard Richards lecture the Graves that kickbacks were necessary to obtain patients. Although the Graves complained about the kickbacks, Mary Walker, a

3

mental health counselor at Oakland, heard Bernard tell a facility director that Oakland paid $10 a day for patient referrals.

Emmins Henry, the owner of Shalom Manor Retirement Home, testified that Richards offered him "help" in the form of "contributions and some finance." Although Richards never told Henry she expected him to refer residents in exchange for her assistance, Henry understood that the contributions were contingent on patient referrals. From 1996 to 2002, Oakland delivered food, clothing, sanitary items, and cash that Henry valued at $4600 a year. Henry explained that the money was earmarked by Oakland to purchase specific items for the residents of Shalom Manor.

Employees knew about the kickbacks. Counselor Mary Walker and therapist Neil Leder saw Richards hand envelopes to drivers and heard Richards instruct the drivers to deliver the envelopes. Secretary Mashama Brannigan received calls from Henry and the owner of another resident facility about payment. The two owners asked if Richards had left a check for them and Richards later brought Brannigan envelopes marked to give to Henry and the other facility owner.

Richards also falsified documents to place in patient files. Richards reviewed transcriptions of progress and physician notes made by Oakland medical

director Dr. Evan Zimmer and other physicians. Richards altered the notes so the assessment and diagnosis would satisfy Medicare guidelines. Richards instructed Dr. Zimmer to sign blank medical documents that Richards would later complete. Richards also devised a process to copy and paste signatures that she used to alter or fabricate documents for patient files. Oakland solicited and accepted patients who did not qualify for Medicare coverage, and Richards enlisted other employees to assist her to fabricate and falsify documents.

At trial, financial analyst Andrea Blencowe of the Federal Bureau of Investigation, testified that Oakland submitted claims that exceeded $28 million and Medicare paid over $9 million of those claims. Blencowe discovered checks from Oakland's account made payable to Harrell and "cash." The checks had been endorsed by Harrell.

Agent Catherine Nazworth testified about her participation in the search and seizure of files from offices at Oakland. On cross-examination, Nazworth testified that she interviewed Mashama Brannigan. Defense counsel asked Nazworth if she knew who had access to Richards's office, and Nazworth explained that the door had a number code lock and Brannigan said she did not know the combination. Counsel next asked Nazworth if she knew "how many people might have known what that combination was?" and Nazworth responded, "I don't know. I guess Ms.

Richards would know." Richards objected and the district court sua sponte instructed the jury to "[i]gnore the last answer."

The next day, Richards moved for a mistrial based on Nazworth's comment. The government argued that the remark was not calculated to comment on Richards's right to remain silent, but the district court construed the remark to involve "the burden of proof in the case." After argument from both sides, the district court ruled that the remark did not deny Richards a fair trial and denied the motion without prejudice with leave to renew if any further comment or argument suggested that Nazworth's comment adversely affected her trial.

Later in the trial, Agent Nazworth testified that the Bureau seized "approximately 600 plus" patient files from Oakland. She selected 168 of the files, numbered 300 through 468, for an in-depth review. Nazworth noticed that 167 of the files contained forged signatures of doctors, patients, and therapists.

At the conclusion of the trial, Richards moved for a judgment of acquittal and argued that there was no evidence to substantiate the charge that Oakland paid kickbacks. The district court denied the motion. Richards called Victoria Allen, the administrator of a retirement home, who testified that she did not arrange with Richards to be paid if she sent her residents to Oakland, but the residents sometimes returned from Oakland with presents or money. Richards renewed her

motion for acquittal, which the district court denied.

The jury found Richards guilty of six counts of making false statements, 18 U.S.C. § 1035(a)(2), and of conspiracy to submit false claims, id. § 286, make false documents, id. §§ 371, 1035(a)(2), launder money, id. § 1956(h), and pay kickbacks, id. §§ 371; 42 U.S.C. § 1320a-7b(b)(2).  The jury acquitted Richards of the remaining 13 counts of making false statements, 18 U.S.C. § 1035(a)(2).

The presentence investigation report listed Richards's base offense level at six, U.S.S.G. § 2B1.1(a)(2), increased it by 20 levels for a loss amount of more than $7 million, id. § 2B1.1(b)(1)(K), increased it by two levels for using sophisticated means, id. § 2B1.1(b)(9)(C), and increased it by four levels for Richards's role as an organizer or leader of a criminal activity that involved five or more participants, id. § 3E1.1(a).  With a criminal history category of I, the report provided a sentencing range between 121 and 151 months of imprisonment.

Richards objected to the calculation of the loss amount on two grounds. First, Richards argued that the government failed to prove a specific loss amount by a preponderance of the evidence.  She alleged that the government failed to prove that every claim she filed with Medicare was fraudulent.  Second, she argued that she should not be held responsible for more than $5 million because that was the amount of restitution imposed against Bernard Graves.  See 18 U.S.C. §§ 371,

7

1035(a)(2).

The district court overruled Richards's objection. The court found that "the intended loss . . . was more than" $7 million based on testimony that established that Richards was intricately involved in activities that were "in large part fraudulent." The district court acknowledged that the guidelines were scored incorrectly for the Graveses, but Richards was not entitled to a windfall because of that mistake. The court sentenced Richards to concurrent terms of 120 months of imprisonment for conspiring to submit false claims, 60 months of imprisonment for making and conspiring to make false statements and conspiring to pay kickbacks, and 121 months of imprisonment for conspiring to launder money.

## II. STANDARDS OF REVIEW

We review de novo challenges to the sufficiency of the evidence and view the evidence in the light most favorable to the government. United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). We also review de novo the application of the sentencing guidelines and examine related findings of fact for clear error. United States v. Humber, 255 F.3d 1308, 1311 (11th Cir. 2001). We review the denial of a mistrial for an abuse of discretion. United States v. Diaz, 248 F.3d 1065, 1101 (11th Cir. 2001).

## III. DISCUSSION

Richards makes three arguments on appeal. First, Richards challenges the sufficiency of the evidence to support her conviction for conspiring to pay kickbacks. Second, she challenges the denial of her motion for a mistrial. Third, she challenges the calculation of her loss amount. We address each in turn.

*A. The Government Introduced Sufficient Evidence to Support Richards's Conviction.*

Richards argues that the government failed to prove beyond a reasonable doubt that she conspired to pay kickbacks. She alleges that the government did not prove there was an express agreement between her and others from which the jury could infer a conspiracy existed. This argument fails.

Sufficient evidence establishes that Richards conspired with the Graveses to pay kickbacks to owners and administrators of assisted living facilities in exchange for the referral of their residents to Oakland. See 42 U.S.C. § 1320a-7b(b)(2)(A). Employees of Oakland testified that Richards told the Graveses that kickbacks were required to generate business and that both Richards and the Graveses spoke to owners and administrators about the amount they would be paid if they referred their residents to Oakland. The Graveses made business checks payable to employee Tabatha Harrell and to cash, which Harrell and Richards apportioned among the owners and administrators. Employees received envelopes from

9

Richards and saw Richards give envelopes to drivers from the different resident facilities for delivery to the owners and administrators. Emmins Henry, the owner of Shalom Manor, testified that Richards implied that Henry would receive supplies and money in exchange for patients. A reasonable jury could find that Richards conspired to pay kickbacks.

*B. The District Court Did Not Abuse Its Discretion by Denying Richards's Motion for a Mistrial.*

Richards argues that the comment by Agent Nazworth that Richards should know who had access to her office was an improper comment on her right to remain silent. Richards argues that the comment was not harmless because access to her office was an important issue in the case and the evidence of guilt was not overwhelming. These arguments fail.

The district court did not abuse its discretion by refusing to grant a mistrial based on Nazworth's remark. An isolated comment, which was elicited by and responsive to the question from defense counsel, about who had access to Richards's office did not substantially prejudice Richards. See United States v. Rodriguez-Arevalo, 734 F.2d 612, 615 (11th Cir. 1984). There also was ample evidence of Richards's guilt. The district court eradicated any possible prejudice when it instructed the jury to disregard the answer. United States v. Simon, 964 F.2d 1082, 1086–87 (11th Cir. 1992).

*C. The District Court Did Not Clearly Err in Calculating the Loss Amount.*

Richards challenges the loss amount. She argues that the district court erred in its calculation because the loss amount was not based on "reliable and specific evidence" and likens the case to the circumstances in United States v. Medina, 485 F.3d 1291 (11th Cir. 2007). Richards also complains that the amount resulted in an unwarranted sentence disparity between Richards and her codefendants. These arguments fail.

The district court did not err in its estimate of the intended loss from the conspiracy. The Medina Court concluded that the district court clearly erred because it did not make specific "factual findings as to the amount of loss" for the loss amounts attributable to individual defendants and the evidence established that Medicare paid for legitimate prescriptions. 485 F.3d at 1304–05. In contrast to Medina, the district court found that at least 40 percent of the $28 million in claims that Richards submitted to Medicare were fraudulent. This was a "reasonable estimate of the intended loss," United States v. Dominguez, 109 F.3d 675, 676 (11th Cir. 1997), based on testimony that about 50 percent of patients were ineligible for treatment in the Medicare partial hospitalization program and Richards falsified documents in a majority of patient files. Richards cites no authority that requires the district court to deviate from this reasonable estimate

11

based on a lower loss amount stipulated to in her codefendants' plea agreements.

## VI. CONCLUSION

Richards's convictions and sentences are **AFFIRMED.**