[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14879
Non-Argument Calendar

_____

D. C. Docket No. 05-60212-CR-AJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES J. SPINELLI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 15, 2008)

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Charles Spinelli appeals his 21-month sentence, imposed after he pled guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349 ("Count 1"), and misprision of felony, or concealing and failing to alert authorities of his knowledge of wire fraud being committed by another, in violation of 18 U.S.C. § 4 ("Count 2"). Spinelli challenges the district court's loss-amount finding with regard to Count 2. The wire fraud upon which this charge was based involved passing off more than $40 million worth of fraudulent letters of credit ("LOC") as collateral for worker's compensation insurance policies. Spinelli discovered that one of the LOCs was fraudulent. In sentencing Spinelli on Count 2, the district court held Spinelli responsible for the full $40 million in loss suffered by the worker's compensation insurance provider. Spinelli argued that he should not have been held responsible for any loss because he could not foresee that the fraudulent LOCS would cause a loss or, alternatively, only should have been held responsible for the value of the LOC that he came to know was illegitimate, or $1.53 million.[1] For the reasons discussed below, we affirm Spinelli's sentence.

---

[1] According to U.S.S.G. § 2B1.1(b), which applies to misprision of felony claims based on wire fraud, the defendant's base offense level should be increased by 22 points if he is responsible for between $20 million and $50 million in loss, but only by 16 levels if he is responsible for between $1 million and $2.5 million in loss. In Spinelli's case, being held responsible for the full $40 million in loss resulted in a guideline imprisonment range of 21 to 27 months, while being held responsible for only $1.53 million in loss would have resulted in a guideline imprisonment range of 8 to 14 months.

2

**I.**

In pleading guilty, Spinelli stipulated to the following facts. As to Count 1, Spinelli was the owner and chief executive officer of Brentwood Capital Corporation ("Brentwood"). He sought to purchase, through Brentwood, a worker's compensation insurance company. To do so, he needed approval from the state insurance regulatory board, or Florida Department of Insurance Regulation ("FDIR"). To obtain this approval, Spinelli sought to artificially inflate Brentwood's assets. Spinelli contacted William Leyton, who owned a company that offered a service called "balance sheet enhancement[]." Leyton and Spinelli agreed that Leyton would open a bank account in the name of "Brentwood Capital" and deposit $5 million in the account. While Leyton would control the $5 million, Spinelli could list the money as a Brentwood asset for the FDIR. In turn, Spinelli applied to purchase a specific insurance company, claiming that the $5 million was an unencumbered asset of Brentwood's. While the application was pending, Brentwood operated the insurance company for approximately 18 months. Ultimately, the FDIR denied the application for unrelated reasons.

As to Count 2, an acquaintance of Spinelli's, Anthony Huff, owned The Cura Group, Incorporated ("Cura"), a company that acquired worker's compensation insurance on behalf of its client companies. To acquire worker's

3

compensation insurance policies from insurance providers, Cura needed to provide collateral that the insurance provider could draw on in the event that Cura defaulted on its obligations to pay premiums and deductibles on the policies. Huff sought to purchase worker's compensation insurance policies from CNA Financial Corporation ("CNA"). Accordingly, Huff sought a source of collateral to post to CNA. With Spinelli's help, Huff contacted Leyton for assistance. Leyton agreed to furnish LOCs, purportedly from a bank and backed by funds under Leyton's management, to serve as the required collateral. Leyton would issue the LOCs on behalf of Cura for the benefit of CNA and would pass them to CNA through Brentwood. All of Leyton's LOCs were fraudulent.

On one occasion, Spinelli became aware that the bank letterhead on one of the LOCs had fallen off of the LOC, suggesting that Leyton had affixed the letterhead to the LOC himself. Despite this obvious sign that the LOC was potentially illegitimate, Spinelli did not advise authorities of the potential fraud taking place. Even when Spinelli was questioned by an attorney with the Securities and Exchange Commission in the course of a separate investigation of Cura's parent company, and specifically asked about the LOCs, Spinelli said nothing. Ultimately, Brentwood "received or brokered" approximately 18 LOCs at a face amount exceeding $40 million. When CNA finally discovered that the LOCs were fraudulent, it suffered a loss equal to this face amount.

4

At Spinelli's sentencing hearing, the stipulated facts were supplemented as follows. The government explained that, over the course of the scheme, CNA paid worker's compensation insurance claims on behalf of Cura thinking that the claims were secured by the LOCs. However, in approximately June 2003, Cura filed for bankruptcy, and CNA learned that the LOCs were fraudulent, could not recover any funds from the fraudulent LOCs, and, therefore, suffered a loss exceeding $40 million.

Mike Sputo, an agent with the Federal Bureau of Investigation ("FBI"), testified that, during an interview he conducted of Leyton, Leyton stated that, early in the course of the LOC scheme, he received a telephone call from two individuals about a bank letterhead "popping off" of one of the LOCs. The individuals may have been Huff and Spinelli, but could have been Huff and another co-conspirator. Leyton told them simply to "glue [the letterhead] back on." Through subsequent investigation, Sputo determined that, of the 18 total LOCs issued, 3 or 4 included a glued- or taped-on bank letterhead. These were the first three or four issued.

Spinelli testified that, in approximately October 2002, Huff showed him an LOC for $1.53 million from which the bank's letterhead had fallen off. Huff and another co-conspirator called Leyton to discuss the letterhead issue. Later, Huff told Spinelli that Leyton had indicated that the LOC in question was not an original and was just a sample for Huff's files. By that time, the LOC "program" was in its

5

fourth or fifth month, and six or seven LOCs had been issued to CNA. While Spinelli found it suspicious that one LOC had a glued-on letterhead capable of falling off, he did not suspect that all of the past LOCs were "fake" because persons at CNA's collateral collection department had received, authenticated, and accepted these past LOCs. Rather, Spinelli was inclined to believe that the LOC in question was not meant to be issued. He did not know if it ever was given to CNA.

Based on the above facts, Spinelli admitted that CNA had suffered more than $40 million in loss as a result of the LOC scheme, but argued that he should not be held responsible for any of the loss because he did not actively conceal the fraud and could not have foreseen that Cura would default on its obligations and cause CNA a loss. Spinelli alternatively argued that he should be held responsible for only $1.53 million in loss because he did not become aware of the scheme until six or seven months after it had begun and could not be held accountable for the loss resulting from every LOC issued.

The government argued that Spinelli should be held accountable for the full $40 million in loss to CNA because he discovered the possible illegitimacy of the LOCs early in the conspiracy and, therefore, could have forestalled any loss by alerting CNA that all of the LOCs may have been fraudulent. The government explained that CNA's loss did not occur when Leyton issued the LOCs or when CNA paid the worker's compensation insurance claims for Cura, but rather when

6

Cura declared bankruptcy and defaulted on its premium and deductible obligations. The government likewise explained that this event occurred long after the letterhead incident and, indeed, after all 18 LOCs were issued. The government further explained that, had Spinelli alerted CNA, CNA could have demanded substitute collateral from Cura long before it defaulted and, thus, suffered no loss.

The district court found that Spinelli was responsible for the full amount of loss. The district court reasoned that, from the time that Spinelli discovered in October 2002 that the LOCs may have been illegitimate until the time when Cura declared bankruptcy in June 2003, approximately nine months passed during which Spinelli could have alerted the authorities and CNA could have obtained substitute collateral to avoid or mitigate its loss.

**II.**

We review the district court's amount-of-loss finding for clear error. <u>See United States v. Cabrera</u>, 172 F.3d 1287, 1292 (11th Cir. 1999). Because the district court is in a unique position to assess the evidence and determine the appropriate loss amount, the district court's finding is entitled to deference. U.S.S.G. § 2B1.1, comment. (n. 3(C)). The government must prove the attributable loss by a preponderance of the evidence. <u>United States v. Dabbs</u>, 134 F.3d 1071, 1081 (11th Cir. 1998). The government must offer "reliable and specific evidence" to satisfy this burden. <u>Id.</u>

7

Pursuant to § 2B1.1, which applies to misprision of felony claims based on wire fraud, the loss that the defendant should be held responsible for at sentencing is "the reasonably foreseeable pecuniary harm that resulted from the offense," or the "pecuniary harm that the defendant knew, or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, comment. (n. 3 (I), (iv)). Likewise, pursuant to U.S.S.G. § 1B1.3, which defines the relevant conduct that should be considered when sentencing a defendant, "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity" should be weighed in determining the amount of loss for which the defendant is responsible. See U.S.S.G. § 1B1.3(a)(1)(B). This provision applies even when the defendant is not charged or convicted of conspiracy for his or her role in the scheme. Id.

**III.**

The district court did not clearly err in holding Spinelli responsible for the full $40 million loss to CNA. See Cabrera, 172 F.3d at 1292. A preponderance of the evidence suggests that the total value of all of the LOCs issued was the reasonably foreseeable pecuniary harm that would result from Leyton's actions. See Dabbs, 134 F.3d at 1081; U.S.S.G. §§ 2B1.1, comment. (n. 3 (I), (iv)), 1B1.3(a)(1)(B). This evidence demonstrates that Spinelli knew, or should have known, under the circumstances, that all of the LOCs potentially were illegitimate,

8

that CNA may eventually need to draw on these LOCs, and that, in that event, CNA would suffer a loss. See U.S.S.G. § 2B1.1, comment. (n. 3 (I), (iv)).

Specifically, because Spinelli pled guilty to misprision of felony and stipulated to facts describing the felony as fraud related to passing off illegitimate LOCs as collateral, it is clear that Spinelli knew that Leyton was engaging in this felonious activity. Any argument that Spinelli did not know of this fraud is without merit, given the guilty plea and stipulated facts. Also, the stipulated facts point to the letterhead incident as the source of Spinelli's knowledge, such that it is clear that Spinelli at least knew that the LOC in question was illegitimate and, therefore, could reasonably have foreseen a loss of $1.53 million to CNA.

However, the evidence suggests that, once Spinelli knew that this one LOC was illegitimate, he had ample reason to believe that all of the LOCs were illegitimate. From Spinelli's guilty plea to Count 1 and the stipulated facts pertaining to this conviction, it is evident that Spinelli knew that Leyton's business revolved around fraud. Knowing that Leyton's business activities were fraudulent and that one of the LOCs issued by Leyton indeed was fraudulent, Spinelli reasonably should have known that any LOC issued by Leyton likely was fraudulent also. Moreover, the evidence demonstrates that Spinelli knew the number and worth of these LOCs, as each made its way through Spinelli's company. Thus, Spinelli could reasonably have foreseen that CNA may

9

experience a loss stemming from each of the LOCs, rather than simply the one.

Furthermore, given that Spinelli was a businessman who operated a worker's compensation insurance company for 18 months, the evidence suggests that he understood the purpose of the LOCs. Thus, Spinelli could reasonably have foreseen that CNA may one day draw on this source of collateral to cover its client's deductible- and premium-paying obligations. Any claim that Cura's bankruptcy and CNA's attempt to draw on the LOCs were unforeseeable intervening causes that removed Spinelli from responsibility is without merit, as serving as collateral to be drawn on in the event of a default was the very purpose of the LOCs.

Moreover, also given Spinelli's business experience, the evidence suggests that Spinelli likely knew that, if he alerted CNA that even one of the LOCs was illegitimate, CNA would have investigated and either demanded other collateral from Cura or stopped doing business with Cura altogether, thereby limiting its loss significantly. Thus, Spinelli could reasonably have foreseen that he could have done something to prevent CNA's loss, such that the evidence illustrates that, but for Spinelli's silence, CNA would not have suffered the $40 million loss. Therefore, reliable and specific evidence supports the district court's amount-of-

loss finding.  See Dabbs, 134 F.3d at 1081.[2]  Accordingly, because the district court did not clearly err in determining the loss amount, we affirm Spinelli's sentence.  See Cabrera, 172 F.3d at 1292.

We note that the Sixth Circuit's recent decision in United States v, Sosebee, 419 F.3d 451 (6th Cir. 2005), supports our conclusion.  In that case, our sister circuit considered whether a defendant convicted of misprision of felony was responsible for the full amount of financial loss suffered by the victim for the purposes of a restitution order.  Id. at 455, 459.  The defendant owned a pharmaceutical sales company and entered into an agreement with a pharmaceutical supply company whereby her company could sell products to government agencies for a lower price.  Id. at 454-55.  Her company initially would pay full price and then, upon selling the products to a government agency, would alert the supply company and receive a refund for the difference in cost.  Id. However, the defendant eventually began selling the products to non-government

_____

[2] We note that Spinelli also has argued on appeal that the district court's amount-of-loss finding was clearly erroneous because it differed significantly from the amount-of-loss finding made in sentencing a similarly situated co-conspirator.  Spinelli points to Jose Kaufman.  The evidence demonstrates that Kaufman signed one of the LOCs, representing that he was the senior vice president of the bank that Leyton claimed issued the LOCs.  Kaufman also let Leyton use Kaufman's telephone number on certain LOCs, representing that it was the number of the bank. Kaufman further forwarded messages from telephone callers looking for the bank to Leyton.  In pleading guilty, Kaufman only stipulated to facts  pertaining to the one LOC he signed.  Because the evidence demonstrates that Kaufman saw only a single LOC when every LOC passed through Brentwood, and that Kaufman's stipulated facts did not reference all 18 LOCs, when Spinelli's did, Spinelli's argument is not convincing.  Rather, it appears that the district court had reason to determine that Kaufman and Spinelli did not merit analogous sentences.

11

agencies and claiming otherwise and demanding a refund.  Id.  When the supply company became suspicious and asked for proof that companies were indeed government agencies, the defendant provided fraudulent documents.  In this manner, she ultimately received more than $2 million in improper refunds.  Id.  On appeal, the defendant argued that she was not liable for any restitution, because her act of concealment took place only after the loss from the fraud occurred.  Id. at 459.  The Sixth Circuit rejected this argument, reasoning that the record demonstrated that "[the defendant] knew of the fraud while the conspiracy was in progress, perhaps even from its beginning. . . and concealed the scheme while it was in progress" and that "but for her continuing concealment of the losses being incurred by [the supply company], those losses might have been avoided altogether or stemmed to a significant degree."  Id.

Although the question in that case was not how much of the loss was attributable to the defendant for the purposes of setting a base offense level, as here, but rather whether the defendant was responsible for any of the loss for the purposes of ordering restitution, the concept that the defendant is accountable for the entire loss where he discovered, and could have done something to prevent, the potential loss in the course of the fraudulent scheme is applicable.

**AFFIRMED.**

12